**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Felstead LARSEN, Defendant-Appellant.**

**No. 74–1742.**

United States Court of Appeals, Tenth Circuit.

Argued July 9, 1975.

Decided July 28, 1975.

Certiorari Denied Jan. 19, 1976. See 96 S.Ct. 859.

George W. Mueller, Jr., Denver, Colo. (Peter J. Wall, Burns & Wall, Denver, Colo., on the brief), for defendant-appellant.

Max D. Wheeler, Asst. U. S. Atty., Salt Lake City, Utah (Ramon M. Child, U. S. Atty., on the brief), for plaintiff-appellee.

Before CLARK,* Associate Justice, Retired, LEWIS, Chief Judge, and McWILLIAMS, Circuit Judge.

CLARK, Associate Justice.

William Felstead Larsen stands convicted by a jury on an information charging him with violation of the National Vehicle Theft Act, 18 U.S.C. § 2312. His sentence is for two years subject to parole at such time as the Board of Parole may determine. His appeal raises six points beginning with insufficiency of the evidence; he questions the failure to give instructions to the jury as to (1) voluntary intoxication as negating specific intent and (2) appellant's good faith as to his belief that he had permission to use the van involved; he claims prejudice in permitting the jury to consider appellant's prior convic-

---

* Honorable Tom C. Clark, Associate Justice, Supreme Court of the United States (Ret.) sitting by designation.

tions for auto theft and third degree burglary for any purpose, and the use of such convictions by the government in closing argument to demonstrate appellant's guilt; he alleges it was error to allow the prosecutor's expression of his personal belief that appellant was guilty; and, he finally, claims that he was denied due process of law as a result of the inadequate representation of his trial counsel. We find no grounds for reversal in any of the contentions.

The Facts: The primary government witness, Herbert Scharosch, was the owner of the 1968 Chevrolet Van in which he was driving on June 19, 1974, when he stopped near Beaver City, Utah, about ten to ten thirty A. M. and picked up Larsen, a hitchhiker. They then drove to Fillmore, Utah, where Scharosch purchased some bread and sandwich spread for sandwiches and they ate lunch along the side of the road. Larsen then began to drive and drove the van all the way to Evanston, Wyoming, some 250 miles, arriving about 9 P. M. Larsen was going to spend the night at the edge of Evanston and Scharosch was going on to North Dakota. They stopped the van at Evanston and each had a bottle of beer in a bar there. After coming out of the bar Scharosch decided to buy some chewing tobacco. At this point the testimony varies. Scharosch testified that Larsen offered to get the van and meet Scharosch at the tobacco store whereupon the latter gave Larsen the keys to the van. Larsen swore that Scharosch told him that he had decided to spend the night in Evanston and then handed over the keys to the van and turned around and walked back across the street in the general direction of the hotel. He further testified that he understood this to mean that Scharosch had given him permission to either sleep in the van or use it at his discretion including going to Ogden to see his children. Larsen buttressed his version of the situation by further testifying that during their trip there was much talk about their respective families and that he had told Scharosch that he was on his way to Yellowstone Park in search of a job but that before going there he hoped to stop in Ogden, Utah, to see his children. In this connection, he testified, that while he and Scharosch were on the way to Evanston they drove within 30 miles of Ogden but that Scharosch made no offer to stop in Ogden and appellant remained silent as to their stopping by to see his children.

Larsen, after getting the keys to the van, drove on to Ogden. When Scharosch came out of the tobacco store and found that Larsen had not driven the van up in front of it he waited some five minutes. He then looked around where the van was parked when they first came to Evanston and not finding it reported to the police. In the meanwhile Larsen went to see his children at Ogden and then drove to Albertson's parking lot where a police officer questioned him between midnight and 2 A. M. about some garbage cans of Albertsons. As to the van, Larsen told the officer that it belonged to Scharosch and that he had loaned it to him at Evanston. The officer arrested Larsen for "something else" and a check at police headquarters revealed that the van was stolen. The officer testified on cross examination that Larsen "had been drinking." In this connection, Larsen testified later that about "five, ten minutes" after Scharosch picked him up in Utah that Scharosch "reached over in the jockey box and pulled out a bottle of whiskey, which was still just under three-quarters full." Larsen testified that the two of them drank the balance of the bottle and that they got "pretty highly intoxicated." Scharosch flatly denied this and testified that during the whole day they had no whiskey and only one beer each after arriving in Evanston around 9 P. M. This conflict in evidence was fully argued to the jury and counsel for Larsen specifically told the jury that the fact "they were both drinking on the way up" did not mean a whole lot; it "doesn't have to do with whether Mr. Larsen stole that vehicle, but it does show, to some degree the credibility of

these two men . . . ." Counsel then went into his sole defense i. e. Scharosch gave Larsen the keys and told him that he was spending the night in Evanston.

### 1. The Sufficiency of the Evidence:

We have the transcript of the evidence and find that it is quite sufficient to support the verdict of guilty. Larsen's sole defense was that Scharosch had given him the keys to the van and said that he was going to spend the night in Evanston which he interpreted, his counsel told the jury "as meaning he could use the car to sleep in or to go to Ogden to see his kids." The jury did not believe the story and found him guilty on the testimony of Scharosch.

### 2. The Failure to Give Any Instruction On Intoxication:

■ The simple answer to this point is that it was not an issue in the case. Rather than depending on intoxication Larsen depended solely on Scharosch's consent. He, therefore, did not request any instruction on intoxication. Larsen's counsel frankly said that (intoxication) "doesn't have to do with whether Mr. Larsen stole that vehicle." However, his counsel now says that it does have to do with negating the specific dishonest intent required under the Dyer Act. He refers to certain language in the case of *United States v. Moore,* 140 U.S.App. D.C. 309, 435 F.2d 113 (1970) in which it was said that such a request for an instruction is not necessarily required "where sufficient evidence of intoxication is adduced." At 114. Larsen commendably admits that he did not exploit this avenue of defense at trial but should not now be precluded from doing so. We do not agree. There is no evidence of intoxication here at the time Larsen took the van. While Larsen did testify as to drinking around 10:30 that morning, the only testimony as to drinking thereafter was one bottle of beer around 9:30 P. M. in the evening. The evidence, even if taken more favorably to Larsen, is that two-thirds of a bottle of whiskey was consumed in the morning, beginning

around 10:30 and extending to lunch when they had sandwiches, fixed from bread and meat, etc., secured in a store, and eaten on the side of the road. The van was driven by Larsen for over 250 miles in the afternoon, arriving at Evanston around 9 P. M. There is no testimony whatever of intoxication (other than the parties had a bottle of beer each) and Larsen took the van and drove to Ogden some 2 hours from Evanston; there he saw his children; picked up some pants and four or five shirts on hangers; drove down to Albertsons for cigarettes; bought some gas for the van remembering even the $1.00 shortage of cash that he had to pay for the same and then his intention to return to Evanston to return the van. At that point he was arrested. The evidence of intoxication at the time of the taking of the van was not only "insufficient," it was wholly lacking. Larsen tries to bolster his defense by citing testimony of the police officer that Larsen "had been drinking" but certainly this is a far cry from being so intoxicated that he did not know what he was doing. The defense is entirely contra to the claim of consent upon which Larsen relied at trial and we cannot permit this change of pace on appeal on the shallow proof of intoxication in this record.

### 3. Failure to Give an Instruction on Good Faith:

■ Our examination of the instructions leads us to conclude that the jury was adequately advised as to the law relating to the defense of good faith. The instructions here were apparently taken from *Beck v. United States,* 305 F.2d 595 (10th Cir. 1962) since they follow closely the language of *Beck.* It appears that the charge given here is tantamount to the charge suggested by Larsen. It is, of course, true as Larsen points out that the Devitt and Blackmar charge in their Federal Jury Practice Instructions, Sec. 37.12, more accurately presents the appellant's theory but we find that the instruction on good faith belief as given was quite sufficient.

#### 4. *The Use by the Government of Larsen's Prior Convictions:*

 We find no merit in the contention that the trial judge abused his discretion in permitting the government to use the convictions Larsen had previously suffered to show his lack of credibility. Indeed, Larsen himself introduced these convictions in the opening statement of his counsel, who told the jury:

"I do know something of my client; he will be candid with you, and you will learn he is no knight in shining armor. Mr. Larsen has been in trouble with the law before; he has been in prison; in fact one of the charges for which he has served time involved a stolen automobile."

On cross examination of Larsen the government bought out without objection that Larsen had been convicted of "grand auto theft in 1959, third degree burglary in 1960, insufficient funds in 1968 and embezzlement in 1973." The court, of course, instructed that these convictions were to be considered only as to Larsen's credibility and not to be considered as evidence of guilt. The introduction of such evidence, as Larsen admits, is within the sound discretion of the trial court. Here, however, Larsen himself first introduced evidence of his guilt in the commission of felonies, including a charge involving a stolen automobile for which he served time. If there was any prejudice Larsen brought it upon·himself. Larsen especially objects to the government bringing out on his cross examination that he had been convicted for grand auto theft in 1959. However this specific conviction was mentioned in Larsen's opening statement to the jury. Again, Larsen himself provoked its repetition by proof. It is true that the conviction was over ten years old but in addition to his having brought it up initially himself Larsen suffered a succession of convictions in 1960, 1968 and 1973 only one year prior to the instant case. This indicates that Larsen has not reformed and justifies the entire string of convictions being used against his credibility. The trial judge appropriately warned the jury and instructed it not to consider such convictions as evidence of guilt but only for strictly impeachment purposes. We, therefore, find no abuse of discretion here.

#### 5. *The Argument of the Prosecution as to Prior Convictions and Personal Belief in Larsen's Guilt:*

 Larsen accuses the prosecutor of going out of bounds in his comment on the claim that Scharosch had loaned Larsen the van to go to Ogden. In discussing why Larsen told the police officer that Scharosch owned the van the prosecutor said "What else was he supposed to tell them? If he had told them it belonged to himself or someone else, he would have been convicted for sure. This man has been around, he knew how far to go." Larsen says that the prosecutor was "implying that because of appellant's prior convictions, specifically the one auto theft, that the appellant knew how to react to the officer's questions." But we do not so interpret this language. There is no reference to any prior conviction. Larsen had made much about the fact he had told the officer that Scharosch owned the van and the prosecutor was reminding the jury that here was a man in his early 40's, married, with several children, on his way to Yellowstone alone, an independent, self sufficient person, without funds, bragging about his drinking proclivities but depending on his own intelligence to get by. Indeed, Larsen had been around. The statement was subject to several interpretations none of them, as we read it, showing any manifest intention by the prosecutor to comment concerning the prior convictions nor being of a character that the jury would naturally and necessarily take them as referring to the convictions as evidence of guilt. See *Knowles v. United States,* 224 F.2d 168 (10 Cir. 1955).

 Nor do we find that the prosecutor was expressing his personal belief in Larsen's guilt when he said in his closing argument:

"I suggest to you, gentlemen of the jury, the defendant in this case would have absolutely no reservation whatsoever, from taking that stand and saying whatever he felt was necessary to get acquitted of this charge."

The prosecutor was talking about the credibility of Larsen as compared with Scharosch. He had said that Scharosch had no motive to perjure himself whereas Larsen had a strong urge so to do. Rather than expressing a personal view of guilt it was merely an effort to show bias, prejudice and motive to lie on the part of Larsen. The sole issue is whether the statement complained of is an expression of the prosecutor's belief in guilt. We find nothing in the language quoted that expresses any belief in guilt. See *Devine v. United States,* 403 F.2d 93 (10 Cir. 1968).

6. *Was Larsen Denied Due Process Because of Inadequate Counsel:*

■ Larsen's counsel had been in active criminal practice for some eight years at the time he defended Larsen. We cannot say that the trial of Larsen was as Larsen described it a "sham, mockery and farce." It is true that his counsel did not interview Scharosch; that he volunteered the information that Larsen was a felon in his opening statement to the jury; that he did not request instructions on intoxication and good faith belief; that he did not object to the jury instructions and that he failed to move for an acquittal at the close of the government's case. But it does not follow that the trial was a sham, mockery and farce. The record clearly shows that Larsen depended on himself to convince the jury that Scharosch did, indeed, give him the keys and his permission to use the car. In the light of the practice followed in Utah of showing defense counsel the U. S. Attorney's file in the case there was no need to interview Scharosch. The cross examination of him by Larsen's counsel reveals that he was fully aware of Scharosch's statements to the government.

Moreover, Larsen's counsel had gone through a preliminary hearing prior to trial. It seems clear that his statement to the jury that he had not interviewed Scharosch was merely trial strategy—a ploy perhaps to indicate that there was no use to interview him because of his bias and prejudice. And often trial lawyers find this to be true. Indeed, many believe that it angers the witness and sets him or her against the defendant all the more. Furthermore, many experienced counsel always tell the jury of the convictions their client has suffered. This tends to take the wind out of the sails of the prosecutor. Likewise advising the jury to use the convictions in testing credibility is a ploy often used by defense counsel when the defendant himself reveals the convictions he gains an honest, straight forward, open minded image with the jury, often indicating reform. This is especially true when he intends to take the stand in his own defense.

The other defaults claimed by Larsen are also explainable. For example, the intoxication defense would have destroyed the consent theory which was much the stronger of the two defenses. The good faith belief instruction was fairly within the instructions given and we see no valid criticism on this count. There is no merit in objecting to instructions that in fact should be given; nor is a motion for acquittal an invariable rule; and objections during argument are frowned on not only by judges but more particularly by juries. Unless the argument is clearly out of bounds and grievously prejudicial the better trial tactic is to leave it alone.

Much can be said of the many errors made during a trial. Monday morning quarter-backing is not only popular among sports fans; we often hear it at the bar. The Constitution does not guarantee a perfect trial, only a fair one. On balance we believe this one to have been fairly conducted as well as fairly concluded.

Affirmed.