**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ricardo A. MONTOYA, d/b/a Ram Corporation, Defendant-Appellant.**

No. 82–1728.

United States Court of Appeals,
Tenth Circuit.

Sept. 12, 1983.

David L. Norvell, Albuquerque, N.M., for defendant-appellant.

William L. Lutz, U.S. Atty., Albuquerque, N.M., for plaintiff-appellee.

Before HOLLOWAY, SEYMOUR, and TIMBERS,[*] Circuit Judges.

TIMBERS, Circuit Judge.

Appellant Ricardo A. Montoya, doing business as the Ram Corporation, entered into an agreement with the Governor's Office Of Community Affairs of the State of New Mexico to "weatherize" homes of elderly, low income New Mexico citizens. The Department of Energy funded the weatherization project as part of the Energy Conservation In Existing Buildings Act of 1976, 42 U.S.C. §§ 6851–73 (1976 & Supp. IV 1980). Montoya subsequently submitted claims to the state agency for work his firm allegedly had completed on the project.

After an investigation, the state agency discovered that Montoya had never completed any work whatsoever. Consequently, the United States indicted Montoya for presenting false claims to the federal government in violation of the False Claims Act, 18 U.S.C. § 287 (1976).

Before trial, Montoya moved to dismiss the indictment for lack of jurisdiction under § 287. According to Montoya, since the state agency administering the weatherization project received no apparent supervision from the federal government, he asserted that his conduct, if criminal, could have violated only state law. The District Court for the District of New Mexico, Howard C. Bratton, *Chief Judge,* denied the motion after an evidentiary hearing. After trial, the jury convicted Montoya on all six counts of presenting false claims to the government. The court later denied a motion for a new trial claiming newly discovered evidence. Montoya was sentenced to five years on each count, the sentences to run concurrently.

Montoya appeals from his judgment of conviction and from the order denying his motion for a new trial. He reasserts that the United States should not have charged him under § 287. He also claims that certain improprieties in the conduct of the trial denied him due process. In the latter category are his claims (1) that the court improperly denied his motion for a continuance in the middle of the trial, arguing that such continuance would have enabled him to obtain out-of-town witnesses whose testimony purportedly would have impeached that of Reuben Gonzales, a key government rebuttal witness; and (2) that the government withheld evidence of its prior offer of immunity to Gonzales, thereby depriving Montoya of critical impeachment material.

Montoya does not challenge the sufficiency of the evidence to support his conviction.

After careful consideration, for the reasons stated below, we affirm the judgment of conviction and the order denying a new trial.

[*] Of the Second Circuit, by designation.

## I.

Appellant's primary contention on appeal is that his activities, however criminal, did not fall within the ambit of 18 U.S.C. § 287, which proscribes the presentment of false claims to the federal government. Section 287 provides:

"Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be [punished]."

Montoya asserts that, since he contracted with the state agency and received payment from the state, he cannot be considered to have presented a claim to the United States or to one of its departments or agencies.

At first blush, Montoya's argument has a certain surface appeal. The statute prohibits only the presentment of false claims to the federal government. The Governor's Office of Community Affairs is not an agency of the United States.

Upon careful analysis of the statute, however, especially in the light of persuasive case law, we find that the initial apparent force of Montoya's argument does not pass muster. According full deference to the maxim that a criminal statute is to be strictly construed, courts have not read § 287 in the literal manner suggested by Montoya. Rather, claims presented to an intermediary have been held to come within § 287 as long as payment comes ultimately from the federal government.

To delineate the scope of § 287, we turn first to *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), in which the Court analyzed components of a violation of § 5438 of the Revised Statutes, the precursor to 18 U.S.C. § 287. In *Hess*, municipalities had awarded bids on public works projects which were funded largely by the federal Public Works Administration. Section 5438 provided that within its purview fell:

"Every person who makes or causes to be made, or presents or causes to be present-

ed, for payment or approval, to or by any person or officer in the civil, military or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent...."

Two companion sections, §§ 3491 and 3493 of the Revised Statutes, provided that an informer could seek damages on behalf of the government for a § 5438 violation and share in any eventual recovery. The private plaintiff in *Hess* had won in the district court, recovering the informer's share for the contractors' fraudulent claims against the municipalities. The Third Circuit, however, overturned the verdict against the contractors on the ground that "[t]he claims of the defendants ... were simply against the local municipalities. Since the defendants had no claim upon or against the United States, this action was not authorized by the informer statutes." 127 F.2d at 237.

In reinstating the verdict entered in the district court, the Supreme Court held that § 5438 did not require a claim to be presented directly to the federal government. It noted that the Public Works Administration disbursed the funds and sponsored the local municipal construction programs; any false claim presented to the local municipality would in turn be passed on to the federal agency. The Court reasoned that "[b]y their conduct, the respondents thus caused the government to pay claims of the local sponsors in order that they might in turn pay respondents under contracts found to have been executed as the result of fraudulent bidding." 317 U.S. at 543. Thus, as long as the claim ultimately would be satisfied out of federal funds pursuant to a federal program, the Court held that the jurisdictional requirements of § 5438 had been satisfied.

One might attempt to distinguish *Hess* on the ground that § 5438 is no longer in effect, having been replaced by the more narrowly drawn § 287. By its terms, § 287 proscribes only the presenting of false claims to an agency of the United States,

not "[causing] to be presented" those claims as prohibited by § 5438. The Third Circuit rejected this attempted distinction in *United States v. Catena,* 500 F.2d 1319 (3d Cir.), *cert. denied,* 419 U.S. 1047 (1974). We find its reasoning persuasive. In *Catena,* a physician had been tried and convicted of fraudulently presenting false Medicare claims for payment. In defense, he asserted that he should have been immune from prosecution under § 287 because he had submitted the claims only to private insurance companies, rather than to the federal government. The court, however, reasoned that:

> "The 'cause' language of the former version of § 287 has clearly been replaced by 18 U.S.C. § 2(b), which states that
>
> > [w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
>
> Just as under the former version of § 287 at issue in *Hess,* under the combination of the present version of § 287 and the present § 2(b) a person may be guilty of causing a false claim to be presented to the United States even though he uses an innocent intermediary (in this case the insurance carriers) to actually pass on the claims to the United States."

*Id.* at 1322–23.

■ We agree that § 287 must be read to include causing a false claim to be presented to the government. Such a reading is consonant with the history of the statute, the surrounding statutory provisions and case law construing the statute.[1]

Montoya argues that even if federal involvement does not have to be direct to provide the basis for a § 287 violation, it must at least be substantial. He characterizes the federal presence in the instant weatherization projects as evanescent—the Department of Energy merely granted the money to New Mexico and retained only minimal control and interest thereafter. He stresses that, because at least some federal funds are commingled with those of the state in a wide array of projects administered at the state level, the federal presence must be manifested during the pendency of the project lest federal jurisdiction be expanded exponentially. While we agree that the federal involvement must be more than nominal, *see Lowe v. United States,* 141 F.2d 1005 (5th Cir.1944), we are persuaded that sufficient federal involvement was present in view of the facts of the instant case.

There can be no dispute that the monies to be paid to Montoya were federal in origin, pursuant to the Department of Energy grant to the Governor's Office of Community Affairs. 42 U.S.C. §§ 6851–73 (1976). Under the terms of every weatherization grant, the administering state agencies are required to detail expenditures periodically and to furnish substantiating audits. 42 U.S.C. § 6867. The contiguous provision, 42 U.S.C. § 6866, requires the Department of Energy to monitor and evaluate each project. The Department has promulgated additional regulations for the states to follow in administering the grants. 10 C.F.R. § 440 (1982). The Department moreover has the power to terminate the state's eligibility to receive grant monies should discrepancies in the state audits arise. 42 U.S.C. § 6868.

■ Montoya argues nevertheless that actual as opposed to titular control over the funds should be the determinative criterion. He reasons that a lump sum grant to a state, prior to implementation of a governmental project, evinces the federal agency's intention to allow the state dominant control in administering the funds. He contrasts the facts in this case to a reimbursement situation as in *Catena,* which at least

---

1. In the instant case, the indictment did not charge Montoya with a violation of § 2(b). However, as in *Catena,* "this omission is not fatal", 500 F.2d at 1323 & n. 7, since the indictment against Montoya provided sufficient notice of the criminal violation by incorporating the phrase, "presented and *caused to be presented* to the United States Department of Energy a claim against the United States which he knew to be fraudulent." *See United States v. Koptik,* 300 F.2d 19, 22 (7th Cir.), *cert. denied,* 370 U.S. 957 (1962).

forces the state after the project's conclusion to demonstrate to the federal government's satisfaction that reimbursement is in order. *United States v. Beasley,* 550 F.2d 261, 270–73 (5th Cir.), *cert. denied,* 434 U.S. 938 (1977) (held that there was a § 287 violation even though claims were presented to the State of Louisiana). Since the Department of Energy in the instant case made the grant to the state before the weatherization project was to commence and then did not monitor its administration on a day-to-day basis, Montoya argues that the federal involvement was insufficient as a matter of law to confer jurisdiction under § 287. We disagree.

We believe that the difference in the timing of federal payment—whether by reimbursement or grant—is not critical. Indeed the Department of Energy has the discretion to choose whether to make a grant before implementation or to wait and seek reimbursement afterwards. 42 U.S.C. § 6867(d). As the Supreme Court stated in *Hess,* "Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states." 317 U.S. at 544. As opposed to the timing of the grant, we believe that the source of the money—indisputably federal in this case—and the nature of the program are dispositive. The weatherization project, although not subject to daily federal control, stemmed from federal and not state legislation. Indeed, contractors were required to follow federal regulations in implementing the project. The state was required to account for all monies spent. This federal control suffices for § 287 jurisdiction.[2]

▪ Montoya suggests that, if the federal presence does not have to be manifest on a day-to-day basis, then knowledge on the part of a defendant of that federal presence

must be a prerequisite to conviction under § 287. We are not persuaded. In enacting § 287 and its predecessors, Congress sought to protect the government from fraudulent claims. A defendant's awareness that the funds ultimately would be provided by a federal agency strikes us as irrelevant. In the analogous context of a charge of making false statements to a federal department or agency in violation of the False Statements Act, 18 U.S.C. § 1001 (1976), courts have held that the government need not prove that a defendant *knew* his statements eventually would be transmitted to a federal agency. For example, in *United States v. Stanford,* 589 F.2d 285 (9th Cir. 1978), *cert. denied,* 440 U.S. 983 (1979), the defendants were charged with making false statements to the Illinois Department of Public Aid to qualify for food stamps and other public assistance. They claimed that they had no way of knowing that the Illinois agency would seek federal reimbursement for the benefits paid in reliance on the challenged statements. The Ninth Circuit, however, held that

> "a statement may concern a matter within federal jurisdiction ... even if the statement is not submitted directly to the federal department or agency involved, and the federal agency involvement is limited to reimbursement of expenditures.... To hold that this knowledge of federal involvement is always required for the purposes of section 1001 jurisdiction, however, would give the term a narrow and technical meaning not intended by Congress."

*Id.* at 297. *See United States v. Baker,* 626 F.2d 512, 516 (5th Cir.1980) (under 18 U.S.C. § 1001 "it is irrelevant whether defendant knew that his intentionally false statements might eventually influence a federal agen-

---

**2.** Although not highlighted by the parties, we believe that a significant aspect of federal involvement for purposes of § 287 is whether federal funds are disbursed pursuant to a comprehensive federal program or project. When funds are spent pursuant to a particular project, the federal interest in preventing fraudulent claims and practices is that much greater. It is the presence of such a federal project and the concomitant federal control that distinguishes the instant case from *Lowe v. United States, supra,* 141 F.2d at 1006, in which the only federal involvement stemmed from a commitment of the United States Maritime Commission to reimburse a private shipbuilder for salaries paid on government contracts. The federal agency had little interest and *no say in* setting the private employees' salaries.

cy."); *cf. United States v. Feola,* 420 U.S. 671 (1975) (statute punishing assaults upon federal officers does not require knowledge that officer was employed by federal government). Just as knowledge of federal involvement is not required in a § 1001 offense, we believe that ignorance of the federal presence does not negate the requisite mens rea for a § 287 violation—the intent to present a fraudulent claim.[3]

We hold that the federal government's involvement in and supervision of the weatherization project brought Montoya's claims within the purview of § 287.

## II.

We turn now to Montoya's contention that he was denied a fair trial.

### (A)

He argues that the trial court abused its discretion in denying his motion for a continuance at the close of the testimony of Reuben Gonzales, a government rebuttal witness. Through the testimony of Gonzales, who had been director of the Sante Fe Community Action Project before being charged and convicted on state fraud counts, the government sought to counteract Montoya's introduction of evidence of good character. Gonzales testified to Montoya's malfeasance with respect to other government contracts. Montoya sought the continuance to afford him time to obtain out-of-town witnesses who allegedly would have impeached Gonzales' testimony.

■ Prior to trial, however, the government had notified Montoya that it would introduce evidence relating to other acts of wrongdoing pursuant to Fed.R.Evid. 404(b).[4] Indeed, Montoya sought to circum-scribe the prosecution's ability to introduce such evidence by a motion *in limine.* Even if Montoya had not been prepared for Gonzales' testimony, the government had apprised him of its intention to introduce evidence that became the subject of that testimony. The trial court clearly acted within its discretion in denying the continuance. *United States v. Mills,* 597 F.2d 693, 698–99 (9th Cir.1979).

### (B)

Montoya's related argument—that the prosecution's withholding of impeachment material denied him a fair trial—we consider to be more serious.

After defense counsel argued for a continuance, he asked the prosecutors whether Gonzales had been offered immunity. While the prosecutors responded that the government did not intend to prosecute Gonzales, they assured defense counsel and the court that no written grant of immunity had been given. After trial, defense counsel learned that the United States Attorney's Office formally had granted Gonzales immunity by a letter dated some six weeks before trial. Montoya raised this matter in his motion for judgment of acquittal or new trial. He asserted that the letter, if introduced, would have been of substantial value in impeaching Gonzales' testimony. Montoya claims that Gonzales' testimony played a critical role in his conviction.

■ Suppression by the prosecution of impeachment evidence may violate a defendant's due process right to a fair trial, *Giglio v. United States,* 405 U.S. 150, 153–54 (1972), irrespective of whether the suppression results from intentional concealment or

---

**3.** We note that there is ample evidence in the record to suggest that Montoya had at least constructive knowledge of the federal involvement. The contract he entered into with the state agency specified that the funding flowed from a Department of Energy contract with the State of New Mexico, and it further specified that federal regulations were to be followed in performing the weatherization work. In fact, the state provided Montoya with federal forms to record the progress of the project. While Montoya testified that he did not read the contract or forms carefully, the evidence presented certainly indicates that he should have known of the federal involvement.

**4.** Fed.R.Evid. 404(b) provides that:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

negligence. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" has been held to be ground for a new trial. *Id.* at 154.

To assess the consequences of the nondisclosure in the instant case, we turn to the framework set forth in *United States v. Agurs,* 427 U.S. 97 (1976), for determining whether the wrongful suppression of evidence compels us to order a new trial. The instant case fits within the second category set forth in *Agurs,* where specific information favorable to a defendant has been requested but not disclosed by the prosecution.[5] The Court held that, to warrant retrial in that context, the suppressed evidence had to be *material*—"implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Id.* at 104.

 Although the prosecution's failure to disclose the written grant of immunity strikes us as inexcusable even if inadvertent, the trial court's conclusion that the omission was not material to the case is clearly correct. Gonzales was only a rebuttal witness who testified to Montoya's conduct with respect to contracts that were not the subject of the § 287 charge. *United States v. Prout,* 526 F.2d 380, 389 (5th Cir.) (to be material, impeachment evidence suppressed must at least affect a "witness whose testimony is crucial to the government's case"), *cert. denied,* 429 U.S. 840 (1976). Moreover, while defense counsel did not realize that Gonzales had been officially granted immunity, he knew that the prosecution did not intend to prosecute him for his involvement in the scams. Counsel

could have cross-examined Gonzales on that, without the letter. Since the requested evidence would have added little if anything not already known, Montoya's claim that the suppressed evidence might have affected the outcome of the trial does not persuade us. While we do not condone such prosecutorial conduct, we uphold the trial court's denial of the motion for a new trial.[6]

After carefully considering in detail each of Montoya's claims of error, we conclude that the judgment of conviction and the order denying a new trial must be affirmed. He was convicted more than a year ago on the basis of overwhelming evidence of serious crimes committed more than three years ago. We order that the mandate issue forthwith.

Affirmed.

---

5. In *Agurs,* the request for information came before trial. We see no reason why the request made during trial in this case should be treated any differently.

6. Montoya also claims that the trial court erred in denying his motion for a mistrial at the conclusion of the prosecutor's summation. In particular, Montoya asserts that the prosecutor's inflammatory remarks unduly influenced the jury. In summation, the prosecutor stated:

"Now, ladies and gentlemen of the jury, on this evidence, I am telling you that we're here today to see that Mr. Montoya gets what he's

got coming to him, and I submit to you that this evidence will support that."

Although this sentence in the prosecutor's summation may not have been an admirable example of reasoned elaboration, it cannot be characterized as an emotional tirade. Our examination of the prosecutor's remark in context indicates that he avoided expressing a personal opinion as to Montoya's guilt; he merely referred to the evidence already presented. *United States v. Larsen,* 525 F.2d 444, 448–49 (10th Cir.1975), *cert. denied,* 423 U.S. 1075 (1976). We hold that the prosecutor's summation does not warrant a new trial.