BLACK, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that the district court did not abuse its discretion when it denied Appellants’ severance motions; therefore, I concur in that result. With respect to the money laundering and false statement convictions, I respectfully dissent.
I. MONEY LAUNDERING CONVICTIONS
To prove money laundering under § 1956(a)(1)(B)®, commonly referred to as the concealment prong of the money laundering statute, see, e.g., United States v. Majors, 196 F.3d 1206, 1211 & n. 11 (11th Cir.1999), we have held the Government must show:
(1) the defendant conducted or attempted to conduct a financial transaction; (2) *1142 the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.
United States v. Miles, 290 F.3d 1341, 1355 (11th Cir.2002). Appellants question the sufficiency of the evidence only as to the fourth element — intent to conceal.
There is no dispute that we review sufficiency of the evidence claims de novo, viewing the evidence in the light most favorable to the Government, with all reasonable inferences and credibility choices made in the Government’s favor. United States v. McCarrick, 294 F.3d 1286, 1289-90 (11th Cir.2002). We will not reverse a conviction on the basis of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Christo, 129 F.3d 578, 579 (11th Cir.1997). The Government need not disprove every reasonable hypothesis of innocence and the jury is “ ‘free to choose among reasonable constructions of the evidence.’ ” Majors, 196 F.3d at 1210 (quoting United States v. Jones, 913 F.2d 1552, 1557 (11th Cir.1990)).
Although the majority correctly states the standard of review, it fails to apply it properly. Appellants presented a credible explanation for the financial transactions shown by the Government, but the jury was not required to accept Appellants’ characterization of the evidence.[1] The evidence admitted at trial was that Randy Blankenship received thirteen checks made out to “H.J. Trucking” from Granite Construction. Randy Blankenship created an account under the name of “Randy Blankenship d/b/a H.J. Trucking” (the DBA account). These checks, totaling $268,978.74, were deposited into the DBA account. Immediately upon deposit, Randy Blankenship wrote out a new check drawn on the DBA account and deposited that check into Tarand’s account. All the proceeds, save $100, were transferred in this manner to the Tarand account.
This evidence was sufficient for a jury to conclude beyond a reasonable doubt that these transactions were designed to conceal from Granite that Tarand was the true beneficiary of the funds Granite thought it was paying to H.J. Trucking— 1.e., to conceal the ownership and control of the proceeds. That this scheme ultimately failed is not determinative. See United States v. Starke, 62 F.3d 1874, 1384 (11th Cir.1995) (concluding “that a money laundering transaction need not conceal the identity of the participants in the transaction,” so long as “the transactions were designed to conceal the funds or the source of the funds”).
The majority’s concern that affirming the money laundering convictions would extend the money laundering statute to virtually all financial transactions involving the proceeds of unlawful activities is not warranted. The critical factor here is that the Blankenships deposited the funds, which were not payable to them, into an account with a false name, and then immediately turned around and redeposited the funds into their own account. This is not merely a case of “money spending.”[2] See Majors, 196 F.3d at 1213.
*1143 Nor does the rule of lenity apply in this case. There is no issue of how the statute should be read. See Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990) (observing that lenity is “reserved ... for those situations in which a reasonable doubt persists about a statute’s intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute” (internal quotation marks omitted)). Rather, we are presented with the clear cut question of whether the Government has provided sufficient evidence to establish concealment under the statute — i.e., a question pertaining to the jury’s factual findings, not to the law. It is this jury finding — supported by substantial evidence — the majority unnecessarily abrogates. Accordingly, I would affirm.[3]
II. FALSE STATEMENT CONVICTIONS
Only Glover challenges his convictions under 18 U.S.C. § 1001(a),[4] which prohibits making a false statement in any matter within the jurisdiction of the United States government. To obtain a conviction, the Government had to prove the following five elements: (1) the existence of a statement; (2) falsity; (3) jurisdiction; (4) materiality; and (5) specific intent to defraud. United States v. Herring, 916 F.2d 1543, 1546 (11th Cir.1990). Here, Glover argues only that the Government failed to establish the third element — jurisdiction. The majority accepts this argument, but it also concludes that, with respect to the convictions involving equipment leases, the Government failed to establish the second element — falsity—as well. Accordingly, the majority reverses all of Glover’s § 1001 convictions on jurisdictional grounds and some of them, in the alternative, on falsity grounds too.[5] Because I disagree with both this result and its rationales, I dissent. I would affirm all of Glover’s § 1001 convictions.
A. Jurisdiction
Glover, a subcontractor, submitted the false statements at issue in this case to Granite, the general contractor. These false statements involved either (1) leases *1144 between H.J. Trucking and other trucking companies showing H.J. Trucking controlled assets it did not,[6] or (2) certified payrolls submitted by H.J. Trucking, claiming various drivers it employed were owner-operators when they were not.[7] Granite relied upon these statements when it certified to the state and federal agencies involved that it was in compliance with the DBE requirement. On appeal, Glover argues there is an insufficient nexus between the federal government’s jurisdiction and these false statements.[8]
The majority concludes § 1001’s jurisdictional requirement is not satisfied for three reasons: (1) this Court’s decision in Herring is inapplicable; (2) this Court’s decision in Lowe v. United States, 141 F.2d 1005 (5th Cir.1944), controls; and (3) the Government failed to establish the federal government supervised the federal funds at issue. I disagree with each of these conclusions.
1. Herring Requires Affirmance
The majority reaches the result it does because it concludes Herring and other cases from this Circuit are inapplicable. In Herring, this Court held § 1001’s jurisdictional requirement was satisfied where the defendant made a false statement to a state agency that received federal funds. 916 F.2d at 1546-47. In reaching this decision, this Court noted that, under § 1001, the false statement does not need to be presented directly to a federal agency; rather, it is sufficient that the false statement is presented to a state agency, which in turn presents it to a federal agency. Id. at 1547. This Court also noted federal funds do not actually have to be used to pay the person making the false statement. Id. Indeed, this Court observed the “state agency’s use of federal fu/nds is generally sufficient to establish jurisdiction under section 1001.” Id. (emphasis added).
Glover argues Herring is inapplicable, given that this case contains an extra link in the chain — i.e., Granite — between him and the federal agency.[9] I see, however, no tangible difference. Glover knew he had to comply with the 51 percent DBE *1145 requirement, which stemmed from a federally-funded program. Indeed, it was his stated intention to comply that brought his company the trucking contract in the first place. Just as the defendant in Herring should have expected the state agency in that case to rely upon his false statement that he was unemployed when, in fact, he was working, id. at 1545, so too should Glover have expected both Granite and the state of Florida to rely upon the false statements he made concerning the DBE program, see id. at 1546-48; see also United States v. Suggs, 755 F.2d 1538, 1542 (11th Cir.1985) (“It is undisputed that ... the false statement need not be presented directly to an agency of the United States or that federal funds actually be used to pay the claimant.”); United States v. Baker, 626 F.2d 512, 514-15 & nn. 5-6 (5th Cir.1980) (holding that jurisdiction exists if the federal agency retains authority to ensure federal funds are properly spent);[10] United States v. Beasley, 550 F.2d 261, 273-74 (5th Cir.1977) (holding that jurisdiction exists where the defendant knows of the federal involvement). Accordingly, I would affirm, based on Herring et al.
2. Lowe
The majority does not apply Herring because it concludes Lowe controls. In my view, there are at least three significant problems with this conclusion. First, the facts in Lowe are quite distinct from the facts in this case, precluding the conclusion Lowe controls. Second, other cases from this Circuit have distinguished Lowe. Third, the majority cites clear and relevant Supreme Court authority, which, when followed, leads to the opposite result.
a. Lowe’s Facts Are Distinct
Lowe involved a defendant that worked for a shipbuilding company on an hourly basis, who was charged with making a false statement regarding a “matter within the jurisdiction of a department or agency of the United States.” 141 F.2d at 1006. The indictment alleged only the following facts: (1) the shipbuilding company had a contract with the U.S. Maritime Commission to build ships; (2) this contract stipulated that the company should make its own payroll payments, but that those payroll payments would be reimbursed by the U.S. Treasury; and (3) Lowe falsely represented to the shipbuilding company’s payroll department that he had worked eight hours when he had not. Id.
Following his plea of nolo contendere, the defendant appealed, questioning “whether the alleged fact that the United States reimbursed the company for its payroll payments was sufficient to make the alleged misrepresentation with respect to the payroll entry a matter within the jurisdiction of a department or agency of the United States.” Id. In a short, six-paragraph opinion, this Court concluded jurisdiction did not exist under the facts alleged in the indictment. Id. In reaching this conclusion, this Court emphasized there was no indication the company’s payroll department had been placed “under the control or supervision of [a federal agency].” Id. Indeed, Judge Waller even went so far as to note in a special concurrence that the conviction would have been affirmed if the indictment had alleged the U.S. Treasury’s reimbursement was cóndi- *1146 tioned “upon [its] receipt and checking of the payrolls upon which payments had been made to the workmen.” Id. at 1006-07 (Waller, J., concurring) (emphasis added).
In summary, Lowe at most stands for the proposition that, to implicate jurisdiction, an indictment must do more than merely allege receipt of federal funds. See id. (Waller, J., concurring) (observing that jurisdiction would exist if the federal agency supervised the recipient of the funds). In this case, additional facts are clearly present. Part II.A.2 explains that the evidence demonstrates the federal government supervised the federal funds at issue in this case. Therefore, the only question that remains (and which is answered in Part II.A.2) is whether this supervision was sufficient to satisfy § 1001’s jurisdictional requirement. Lowe, however, is of no help in this endeavor, as the indictment there contained no allegations whatsoever concerning supervision. See id.
b. Eleventh Circuit Cases Have Distinguished Lowe
As Lowe simply stood for the proposition that receipt of federal funds was not by itself sufficient to trigger jurisdiction, it remained for subsequent panels of this Court to determine what additional fact or facts had to be present for jurisdiction to exist.
A clear body of law gradually emerged. In 1976, this Court held jurisdiction exists where the defendant knows of the federal government’s connection to the funding at issue. United States v. Lange, 528 F.2d 1280, 1287 n. 11 (5th Cir.1976) (distinguishing Lowe). This Court applied the same reasoning in a second case in 1977. See Beasley, 550 F.2d at 273-74 (holding that jurisdiction exists where the defendant submits false claims to the state, knowing the state will rely on them to seek reimbursement from the federal government). Then, in 1980, we clarified that, even if the defendant has no knowledge of federal involvement, jurisdiction still exists if it is clear the federal government retained authority to ensure federal funds are properly spent. See Baker, 626 F.2d at 515 n. 6:
[S]ome courts have expressed a reluctance to sustain a conviction under § 1001 when the false statements were submitted to a private employer under government contract, and when the defendant had no knowledge of federal involvement. See Lowe v. United States, 141 F.2d 1005 (5th Cir.1944). These cases are clearly distinguishable from the case we consider today since in [cases like] Lowe it was not apparent whether the matters involving private contractors were “within the jurisdiction of a federal department or agency,” while in the case at hand agency jurisdiction is clear. [The local agency] was required to make quarterly reports to [the federal agency], and [the latter] retained the ultimate authority to see that the federal funds were properly spent,
(some citations and internal quotations marks omitted).
Not only was the law relating to whether jurisdiction existed clear in this Circuit prior to the majority’s contribution, but it also was in accord with that of every other Circuit that had cited Lowe — all of which distinguished that case. See United States v. Stanford, 589 F.2d 285, 297 (7th Cir.1978) (adopting, in effect, this Court’s conclusions in Lange and Beasley); United States v. Candella, 487 F.2d 1223, 1226-27 (2d Cir.1973) (same); Ebeling v. United States, 248 F.2d 429, 435 (8th Cir.1957) (same); United States v. Gibson, 881 F.2d 318, 322-23 (6th Cir.1989) (adopting, in effect, this Court’s conclusions in Baker); United States v. Montoya, 716 F.2d 1340, *1147 1343-45 (10th Cir.1983) (same); Nye & Nissen v. United States, 168 F.2d 846, 850-51 (9th Cir.1948) (same).
The majority’s opinion alters this body of well-settled law by adding facts to the indictment in Lowe that this Court itself acknowledged were not present.[11] The majority observes:
It strains credulity to believe that a shipbuilder under contract with the federal government to build ships would not be required to submit progress reports, or that the federal government lacked the “ultimate authority” to ensure that it was actually getting what it paying for.
(Opinion at 1140.) In effect, the majority is saying that — because (1) federal supervision must have been present in Loive, and (2) this Court nevertheless held there was no jurisdiction' — -the existence of federal supervision here is insufficient to trigger jurisdiction for purposes of § 1001.[12]
As this Court acknowledged in Lowe, however, the only issue there was whether alleging receipt of federal funds was sufficient to trigger jurisdiction. 141 F.2d at 1006:
[T]he validity of the indictment depends upon whether the alleged fact that the United States reimbursed the company for its payroll payments was sufficient to make the alleged misrepresentation with respect to the payroll entry a matter within the jurisdiction of a department or agency of the United States.
See also id. (explaining there was no indication the shipbuilding company was supervised by a federal agency); id. at 1006-07 (Waller, J., concurring) (noting that jurisdiction would have existed if some degree of federal supervision had been present). Thus, the majority’s assumption that some degree of supervision was present is entirely without foundation. It is also contrary to how this and every other Circuit has approached Lowe up until this instant.
c. Relevant Supreme Court Authority
Lowe acknowledges no authority for the interpretation of § 1001’s jurisdictional requirement.[13] Since Lowe, the Supreme Court has provided authority holding that § 1001’s jurisdictional requirement is to be interpreted broadly. See United States v. Rodgers, 466 U.S. 475, 479, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984):
“Jurisdiction” is not defined in the statute. We therefore start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used. The most natural, nontechnical reading of the statutory language is that it covers all matters confided to the authority of an agency or department. Thus, Webster’s Third New International Dictionary 1227 (1976) broadly defines “jurisdiction” as, among other things, “the limits or territory within which any particular power may be exercised: sphere of authority.” A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation. Understood in this way, the phrase “within the jurisdiction” merely *1148 differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body.
(emphasis added; most citations and internal quotation marks omitted); Bryson v. United States, 396 U.S. 64, 70-71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969):
Because there is a valid legislative interest in protecting the integrity of official inquiries, we think the term “jurisdiction” should not be given a narrow or technical meaning for purposes of § 1001. A statutory basis for an agency’s request for information provides jurisdiction enough to punish fraudulent statements under § 1001.
(footnotes and citations omitted).
In my view, this Court’s decisions in Hemng et al. are in accord with the Supreme Court’s decisions in Rodgers and Bryson, while the majority’s opinion in this case is not. The Supreme Court’s instructions were to read § 1001’s jurisdictional requirement broadly, yet the majority reads it narrowly.[14]
3. The Federal Government Supervised the Federal Funds
Once one concludes Herring and Baker constitute binding authority, and, by extension, that jurisdiction exists if there is federal supervision of the federal funds at issue, the question becomes whether there was federal supervision in this case. Unlike the majority, (Opinion at 1136-37), I believe there was supervision here.
In support of its conclusion that there was no supervision, the majority relies on United States v. Lutz, 154 F.3d 581 (6th Cir.1998). Lutz ran a loan origination company, where she filled out applications on behalf of potential borrowers and submitted them to private banks in order to obtain HUD-backed loans for those borrowers. Id. at 585. In these applications, Lutz certified she had met face-to-face with her clients when she had not actually done so. Id. She was convicted of violating § 1001. Id. at 586. On appeal, Lutz made two relevant arguments: (1) the statute of limitations had run; and (2) § 1001’s jurisdictional requirement was not met. Id. at 586-87.
With respect to her first argument, Lutz contended that, since (1) the crime was complete when she “submitted the initial application forms to the [bank],” (2) the statute of limitations was five years, (3) the date on the forms was more than five years ago, and (4) no evidence was presented at trial indicating when the forms were actually submitted, the statute of limitations had run. Id.
With respect to her second argument, Lutz contended there was no evidence the forms had ever been submitted to HUD; therefore, § 1001’s jurisdictional requirement was not met. Id. at 587.
The Sixth Circuit rejected both arguments. Somewhat confusingly, it concluded that while there was no jurisdiction for statute of limitations purposes until HUD actually received the forms, § 1001’s jurisdictional requirement was satisfied *1149 even though the forms never reached HUD. Id. at 586-87.
Although it does not so specify, the majority focuses entirely on the Sixth Circuit’s treatment of Lutz’s first argument— i.e., her argument concerning the statute of limitations.[15] In my view, the majority’s discussion of Lutz is misleading because it completely fails to note that Lutz’s second argument concerned § 1001’s jurisdictional requirement, and the Sixth Circuit held, after addressing that argument at length, that the requirement was satisfied:
There is no implicit requirement that the [false] statements be made directly to, or even be received by, the federal department or agency. False statements made in any matter within the agency’s jurisdiction are within the scope of § 1001, and courts have upheld § 1001 convictions for false statements made to private entities receiving federal funds or subject to federal regulation or supervision.
HUD had supervisory authority over the lending institution with regard to the loans at issue. HUD had various requirements and rules that the lending institutions and loan originators were expected to comply with in accepting loans for the program, including the requirement that face-to-face interviews occur. When Lutz submitted the final loan packages to HUD, which tvere approved by the lending institution in part on the basis of the false certification, this was sufficient to constitute a false statement in violation of § 1001.
154 F.3d at 587 (emphasis added; citations and quotation marks omitted).[16] Significantly, the Sixth Circuit went on to affirm the § 1001 conviction. Id. at 591. Accordingly, I disagree with the majority that Lutz supports the result it reaches.
Instead of applying the Sixth Circuit’s decision in Lutz, I would apply this Court’s decision in Baker. In Baker, this Court held “supervision” exists where (1) the nonfederal entity to which the false statements were initially made was required to submit reports to the federal agency, and (2) the federal agency retained authority to ensure federal funds were properly spent. See Baker, 626 F.2d at 515 n. 6; see also Herring, 916 F.2d at 1546-47 (finding jurisdiction where the nonfederal entity had to comply with a federal statute before it could receive any funds); cf. Webster’s Third New International Dictionary 2296 (1976) (defining “supervision” as “direction, inspection, and critical evaluation: oversight”).
During the trial in this case, witnesses testified as follows: (1) the Federal Highway Administration and the Florida Department of Transportation agreed that Florida would receive federal funds, provided all federal guidelines were met; (2) Florida was required, prior to receiving funds, to certify all such guidelines would *1150 be met; (3) if Florida did not comply with the federal guidelines, it would lose federal funds; and (4) one of the federal guidelines that Florida had to comply with was the DBE requirement. Based on this evidence, I would hold the federal agency in this case supervised the federal funds at issue.
Accordingly, because I believe supervision was present here, I would affirm.
B. Falsity
The majority also reverses Glover’s convictions on Counts 5-7 and 10-12 because it concludes the underlying equipment leases[17] cannot, as a matter of law, constitute false statements for purposes of § 1001. In its analysis, the majority correctly notes that many of our sister Circuits have upheld convictions pursuant to § 1001 where the defendants “made promises or guarantees concerning their future actions that, at the time they made those promises, they had no intention of carrying out.” (Opinion at 1133.) It further notes many of these cases involved false guarantees made on applications for government benefits — i.e., instances where the defendants qualified for a federal benefit only because they promised in their applications to perform some action in the future they had no intention of actually performing. (Id. at 1132-33.) To this point, I agree with the majority.
The majority goes on to conclude, however, that, because contracts are not applications for benefits, the former cannot, as a matter of law, constitute false statements for purposes of the statute. In support of this conclusion, the opinion explains that (1) contracts only serve to establish a legal relationship among the parties involved, (2) breach is not illegal, and (3) “efficient” breach is often even socially desirable. (Id. at 1133-34.) In my view, this portion of the majority’s analysis is beside the point. Significantly, it is not just the equipment leases, standing alone, that are at issue here.
The Government did not prosecute Glover merely because his company made a contractual promise it did not intend to keep. Rather, the Government prosecuted him because he took the additional step of presenting his company’s contractual promises in writing to Granite — to demonstrate his purported compliance with the Federal Department of Transportation’s DBE requirement. Significantly, at the time these presentations were made, Glover knew the leases did not reflect the reality of the situation, and he knew Granite would rely on them.[18] *1151 Moreover, if Granite had not been misled into believing Glover’s company was in compliance, the latter would not have been participating in the project. As far I am concerned, the analysis here need go no further. I see no tangible difference between the equipment leases in this case and false statements incorporated into applications for government benefits. In my view, both fall within § 1001’s scope because both involve defendants lying to obtain government benefits to which they are not entitled.
One additional aspect of the majority’s opinion troubles me: the falsity issue is being raised sua sponte. As the issue appears to be a question of first impression in this Circuit, I am somewhat reluctant to address it, given that it has not been briefed and argued in the adversarial context.[19] I am also concerned because— apart from its conclusion that contracts and applications simply must be treated differently for purposes of § 1001 — the majority’s analysis hinges entirely on its application of the Supreme Court’s decision in Williams v. United States, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), which is questionably relevant in that this Court previously opted to apply it narrowly in United States v. Swearingen, 858 F.2d 1555 (11th Cir.1988) (per curiam).
The defendant in Williams was convicted under 18 U.S.C. § 1014, which prohibits making a “false statement” to a federally insured bank. 458 U.S. at 280-82, 102 S.Ct. at 3089-90. The defendant had been depositing checks drawn on one account into a second account, knowing there were insufficient funds in the first account to cover those checks. Id. The Supreme Court overturned the conviction, concluding a check could not be a “false statement,” since, “technically speaking, a check is not a factual assertion ... and therefore cannot be characterized as ‘true’ or ‘false.’” Id. at 284, 102 S.Ct. at 3091.
In Swearingen, this Court considered whether Williams applied in a factual context not involving the presentation of an overdrawn check and concluded it did not. Swearingen involved two automobile dealers who took turns presenting their bank with drafts drawn on the other’s dealership. 858 F.2d at 1556. Each such draft represented that one dealer had purchased a car from the other, and that he would pay for it by honoring the draft. Id. In actuality, no cars had been sold, but, since the bank was convinced otherwise, the dealers were able to maintain artificially inflated balances and receive interest-free credit. Id. One of the dealers was convicted of violating 18 U.S.C. § 1344(a)(2), which required the Government to prove— inter alia — that he had made false representations. Id. at 1555-56. On appeal, the dealer cited Williams and argued that, because the Supreme Court had held checks could not be false statements, the drafts at issue in his case could not be considered false statements either. Id. at 1557. This Court soundly rejected the dealers’ argument:
*1152 [T]he [dealers] knew that the Bank believed that the ... drafts represented actual, legitimate sales of vehicles, and that [they] used that perception to deceive the Bank in order to obtain an immediate credit on non-existent sales. Accordingly, through the [sight] drafts involved in this case the [dealers] made false factual assertions with the specific intent to defraud the Bank.

Id.

In my view, the equipment leases in this case performed the same function as the drafts in Swearingen. See id. at 1558 (characterizing the “sales” described in the drafts as “simply ‘paper’ transactions with no purpose other than to obtain interest-free financing from the Bank”). They should thus be deemed false statements too.[20]
III. CONCLUSION
For the reasons stated, I would affirm the money laundering and false statement convictions.

. Indeed, Appellants' contention that the DBA account was set up per the bank's instruction, strictly speaking, is not inconsistent with the jury verdict. "Concealing the source of funds does not need to be the only goal of the pertinent transaction.” United States v. Abbell, 271 F.3d 1286, 1298 n. 10 (11th Cir.2001).

. I also note that at least two factors listed by the Court in Majors as probative of intent to *1143 conceal are arguably present in this case: namely, the depositing of illegal profits in the bank account of a legitimate business, and the use of a putative third party (H J.Trucking) to conceal the real owner of the proceeds. See Majors, 196 F.3d at 1213 n. 18.

.United States v. McGahee, 257 F.3d 520 (6th Cir.2001), upon which the majority places great reliance, is distinguishable. In that case, funds were deposited from a government agency into an account designated "Douglas J. McGuire d/b/a W.G. Williams Enterprises.” Id. at 524-25. McGuire did not, however, go on to transfer the funds to another account (unlike the Blankenships, who immediately transferred the funds to the Tarand account). Rather, he either converted the funds in the DBA account directly into cash or used them to pay off his personal mortgage. Id. at 525. Accordingly, the Sixth Circuit found there was no evidence of a design to conceal the proceeds of illegal activity. Id. at 528.

. The indictment charged Glover with "makfing] and us[ing] a false writing and document, knowing the same to contain materially false, fictitious and fraudulent statements and entries, in a matter within the jurisdiction of the United States Department of Transportation” and seeking "to create the false appearance that H.J. Trucking was performing and managing the work required under the subcontract between Granite and H.J. Trucking.” Glover was convicted on Counts 5-7 and 10-12, which involved equipment leases between H.J. Trucking and other trucking firms, and Counts 13-15, which involved wage and hour records submitted by H.J. Trucking.

. All of Glover's § 1001 convictions are reversed on jurisdictional grounds, and the convictions on Counts 5-7 and 10-12 are also reversed on falsity grounds.

. After Granite had subcontracted with H.J. Trucking, inspectors noticed that both Tarand and J.D. Miller trucks were showing up at the job site bearing H.J. Trucking insignia. The inspectors refused to let these trucks be used unless it could be shown they were leased to H.J. Trucking. Accordingly, Tammy Blankenship created leases to satisfy the inspectors, on the off chance they might again check truck ownership. Significantly, these same leases were also used to convince Granite that H.J. Trucking was in compliance with the 51 percent requirement.

. To show that it was following federal wage tables, H.J. Trucking submitted weekly "certified payrolls” to Granite listing the H.J. Trucking employees who had worked on the project that week, the hours they worked, and the wages they were paid. Granite in turn forwarded these certified payrolls to the Florida Department of Transportation. Each of these payrolls identified truck drivers as "owner-operators” when, in actuality, the drivers neither worked for H.J. Trucking nor were owner operators; rather, they worked for either Tarand or one of Miller’s companies.

. In effect, Glover is challenging the sufficiency of the evidence with respect to jurisdiction — the third element. See Alikhani v. United States, 200 F.3d 732, 735 (11th Cir.2000). In reviewing a conviction for sufficiency of the evidence, this Court "examine[s] the evidence de novo in the light most favorable to the government, to determine whether a reasonable jury could have concluded beyond a reasonable doubt that the defendant was guilty of the crimes charged.” United States v. Toler, 144 F.3d 1423, 1428 (11th Cir.1998).

. In Herring the chain of reliance upon the false statement consisted of three links, including the source of the false statement: (1) the defendant; (2) the state agency; and (3) the federal agency. 916 F.2d at 1546-47. *1145 Here, the chain contains four links: (1) Glover, who was a subcontractor; (2) Granite, the general contractor; (3) the state agency; and (4) the federal agency.

. In. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

. Given that Lowe involved the sufficiency of facts alleged in an indictment, I believe it is improper for the majority to speculate about what facts were “quite likely,” (Opinion at 1140), “may have” existed, (id.), or the lack of which “strains credulity,” (id. at 1140).

. Note that this result is contrary to this Court’s holding in Baker that federal supervision satisfies § 1001's jurisdictional requirement. 626 F.2d at 514-15 nn. 5-6.

.Lowe occupies little more than a single page in the federal reporter and is utterly devoid of citation to authority. See 141 F.2d at 1006-07. Indeed, the only citation is to the statute at issue, 18 U.S.C. § 80, which preceded § 1001.

. In my view, there are only two possibilities here. Either the majority is wrong about Lowe, which I think it is, or the majority is correct, and the Supreme Court has overruled Lowe sub silentio. With respect to the second possibility, an argument could be made that, at the time Lowe was decided, the Supreme Court had not yet established a framework for analyzing the jurisdictional requirement, although it has done so since. Therefore, the argument would go, Lowe was overruled sub silentio because it did not follow that framework. Given, however, that the majority's conclusions are contrary to those of the other Circuits that have cited Lowe, I believe the first possibility to be the case.

. The majority even quotes from the Sixth Circuit’s discussion of the statute of limitations:
"At the time [the defendant] submitted the forms ... HUD did not have jurisdiction because the final loan application package had not been submitted to it. Furthermore, HUD had no authority over the lending institution at this point with regard to whether or not the institution would accept the loan. Therefore, the matter was not within HUD’s jurisdiction.”
(Opinion at 1137 (quoting Lutz, 154 F.3d at 586-87)).

. For an explanation of why these leases were created, see supra note 6.

. The majority claims there is a need to avoid judicially creating a national "false contract” law, under which merely entering into a contract absent an intention of performing might expose a person to federal prosecution. (See Opinion at 1135.) I must admit this concern perplexes me, as a person cannot be convicted under § 1001 unless the Government proves all five elements of the crime— including, significantly, specific intent. See Heiring, 916 F.2d at 1547. To reiterate, it is not entering into a contract absent an intent to perform that triggers § 1001’s applicability. Rather, what triggers § 1001’s applicability is taking the additional step of representing to the government that such a contract reflects reality, knowing full well it does not. See United States v. Swearingen, 858 F.2d 1555, 1557-58 (11th Cir.1988) (concluding that presenting sham transactions as valid constitutes making a false statement). In the first instance, there is no specific intent to mislead the government. In the second, there is. Thus, it seems the majority has committed the logical error of importing a concern ad-dresséd by one element' — specific intent — into its analysis of another — whether there was a false statement. See Baker, 626 F.2d at 516 (noting that the specific intent requirement "serves to insure against punishing one who has committed no culpable act”). In my *1151 view, if there is any concern regarding "innocent" persons potentially being swept up into the statute’s scope, that concern should be addressed by analyzing whether there was specific intent to mislead — not whether there was a false statement.

. The majority focuses exclusively on § 1001(a)(3), which is concerned with whether there was a false writing. Had this issue had been raised by the parties, I would have wanted to ask them whether they thought § 1001(a)(2) might also apply, as that provision requires merely that there have been a "false ... statement or representation" and makes no mention of a "writing.” After reviewing the indictment and the record, I am not, at this stage, comfortable concluding the latter subsection is inapplicable.

. The majority declines to apply Swearingen on the ground that the drafts at issue in that case involved false statements of past fact, where the leases at issue in this case involve only contractual promises. (Opinion at 1135 n. 30.) I am not persuaded because, as already noted, the leases in this case were presented to Granite as indicative of reality— specifically, that Glover controlled the assets he claimed to — when they were not. See supra note 6 and accompanying text.