UNITED STATES of America, Plaintiff–Appellee,

v.

Alenjandro LOPEZ a/k/a Flaco, John Doe a/k/a El Negro a/k/a Ramon De Los Santos, Raul Hernandez, Juan Raymond Herrera, Thomas Bahr, Defendants–Appellants.

No. 88–6090.

United States Court of Appeals, Eleventh Circuit.

March 9, 1993.

Juan De Jesus Gonzalez, Geoffrey C. Fleck, Miami, FL, for Ramon De Los Santos.

Glenn Feldman, Miami, FL (Court-appointed), for Raul Hernandez.

Maria Rivas Hamar, Hamar & Hamar, Playa Del Ray, CA, for Juan Raymond Herrera.

Lydia Fernandez, Miami, FL (Court-appointed), for Thomas Bahr.

Michael J. Doddo, Ft. Lauderdale, FL, for Alejandro Lopez.

Howard C. Vick, Jr., Geoffrey R. Brigham, Kathleen M. Salyer, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for U.S.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

Appellants Juan Herrera, Raul Hernandez, Ramon De Los Santos, Alenjandro Lopez and Thomas Bahr were convicted of charges involving a criminal conspiracy to import marijuana. Appellants appeal their convictions on various grounds. We affirm.

## BACKGROUND

### I.

Co-defendants Juan Herrera and Raul Hernandez headed a drug organization in the Naples, Florida area which was responsible for offloading marijuana transported to Florida's west coast from Colombia. Arrangements for offloading were made with numerous participants in the drug operations by Herrera, who was the owner of incoming marijuana shipments. Hernandez took orders from Herrera. Thomas Bahr's activities as a radio man included guiding the boats and watching for law enforcement activity. Ramon De Los Santos and Alenjandro Lopez served as workers in the conspiracy. During offloading operations, Herrera used his two fishing boats as "mother ships" to transport the marijuana. Workers for the organization offloaded the cargo into small speed boats to bring the marijuana onshore for delivery by truck.

Herrera and Hernandez were charged as participants in a March–April 1985 importation to the Coconut Island area, north of Naples, Florida. This incident was charged as an overt act in the conspiracy. Eric Reinertsen, who later testified as a government witness, was recruited by Herrera to help offload about 18,000 pounds of Herrera's marijuana from the vessel, My Four Ladies. Reinertsen hired the other offloaders. Following the offloading, Reinertsen was paid approximately $1 million by Herrera, from which Reinertsen distributed pay-

ment to the workers in the group. He gave about $15,000 to Bahr, and kept $250,000 for himself.

Herrera organized another importation in May 1985. Herrera and Hernandez met with Reinertsen in Naples to arrange for the offloading of the shipment of 25,000 pounds of marijuana. De Los Santos accompanied Herrera. Bahr leased his boat to the operation for $30,000. On May 10, Herrera, Hernandez, Reinertsen and others left Naples at night in Bahr's boat to rendezvous with the offloading group. Herrera and De Los Santos assisted the offloaders by carrying marijuana across a beach on Key Waydin Island to small boats that were waiting on the other side of the island. They took the marijuana to Whiskey Creek in Naples. Herrera paid Reinertsen, who distributed payment to the workers. Bahr was paid for his participation.

A more sophisticated operation was organized by Herrera in November 1985. His new vessel, the Captain JR, was outfitted with state-of-the-art navigation equipment and large fuel tanks. Workers operated radios from a motel in Fort Myers. Bahr ran a surveillance boat offshore and leased another boat to the organization for $30,000. Herrera, Hernandez and Reinertsen, returned to Naples with the workers by boat following the offloading. In the early morning, the incident drew the attention of an officer of the Naples police department when he heard the sound of a boat but saw no navigation lights. Two officers questioned the offloaders who were observed waiting near a boathouse. An officer questioned Bahr as he was seen walking away from his father's house at approximately 5:45 a.m. that same morning. Bahr answered the officer's questions by explaining that he was returning from fishing. No fishing gear was found on the boat docked behind the residence. This boat was registered to a relative of one of the offloaders. After the workers returned to Coconut Island to load the marijuana on to trucks, the entire shipment was seized by law enforcement officers who had conducted surveillance.

Another importation was set up to drop off marijuana in February 1986 to the Herrera group. Herrera, Hernandez, De Los Santos and others met to plan the offloading with Reinertsen. During the operation, De Los Santos was in one of the small offloading boats. Bahr operated police scanners from a motel. Workers in this operation slept in a guest house behind Reinertsen's home before setting out to retrieve the marijuana from Key Waydin Island. The offloading activity was discovered by law enforcement agents. As they moved in, gun shots were fired. Bahr reported the gunfire to Reinertsen. Because the operation was not completed according to plan, the boat captain, Terri Breiceno, did not receive his full payment of $175,000. After Breiceno complained to Herrera's wife, an arrangement was made for De Los Santos to deliver an additional payment of $1,000. When a later payment of $51,000 was made to Breiceno by Hernandez, De Los Santos was outside the meeting place in Herrera's Mercedes. Breiceno later testified as a government witness.

Delivery of a 90,000 pound cargo of marijuana was set up in September 1987. Herrera negotiated the deal with suppliers in Colombia. He agreed to offload and sell the entire cargo, although he would own only half the load. The scheduled departure from Columbia was September 22. Herrera was arrested on September 23.

## II.

The indictment charged 23 coconspirators. When a jury trial was scheduled for mid-summer in 1988, the district court excused as potential jurors all college students who would soon be returning to classes, based on the hardship of long service on a jury. It was expected that the trial of multiple defendants in a large-scale drug conspiracy would not be concluded by the beginning of the college semester. The trial lasted from July 26 to August 16, 1988.

## III.

Reinertsen was a key government witness. Another coconspirator, Danny Dan-

iels, told an FBI agent that he did not think that Bahr was involved in the two offloadings that took place in May 1985 and February 1986. The interview with Daniels occurred after Daniels pled guilty and after Reinertsen testified at the trial about Bahr's involvement in the offloadings. The government interview concerned possible cooperation by Daniels. The government perceived a possible *Brady* issue arising from this situation after hearing Daniels' recollections of Bahr's involvement. The prosecutor dismissed the counts against Bahr related to May 1985 (Counts 7–9) and February 1986 (Counts 13–15) to avoid having to deal with *Brady* material. The charges relating to November 1985 were not dismissed. A redacted indictment was given to the jury.

The court disagreed that dismissal of the counts remedied the *Brady* problem and ordered disclosure of Daniels' statement. In open court the prosecutor reported that Daniels had told the agent that Bahr had been involved in the November offloading (Counts 10–12), but not "in the other loads that had been charged in the indictment". Daniels felt that Reinertsen "ha[d] not completely remembered the facts...." Daniels feared retaliation from the Herrera organization, and therefore was not a witness for the government at trial.

## IV.

Juan Herrera, Raul Hernandez, Ramon De Los Santos, Alenjandro Lopez and Thomas Bahr were convicted of conspiracy violations under 21 U.S.C. §§ 963 and 846 and 18 U.S.C. § 2 and importation violations under 21 U.S.C. §§ 952(a), 955, 960(a)(2) and 18 U.S.C. § 2. Herrera, Hernandez and De Los Santos were convicted of the additional charge of attempting to import marijuana, in violation of 21 U.S.C. §§ 952(a) and 963 and 18 U.S.C. § 2. Herrera and Hernandez were also convicted of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848.

## ISSUES RAISED BY LOPEZ, HERRERA AND HERNANDEZ

Lopez assigns as error (1) duplicitous allegations of conspiracy and (2) insufficiency of the evidence.

Herrera assigns as error (1) denial of his motion to suppress evidence of his identification and (2) denial of his motion to suppress evidence obtained pursuant to wire and oral interceptions.

Herrera and Hernandez assign as error (1) excuse of college students in the venire pre-*voir dire*, (2) lack of qualification of the government expert witness, and (3) error in denying motions for an order requiring the production of past psychiatric reports of government witness Reinertsen, and failure to require a psychiatric examination of him.

We have examined these several assignments of errors and find them to be without merit. Accordingly, we affirm the convictions of Lopez, Herrera and Hernandez.

## ISSUES RAISED BY BAHR

Bahr presents one issue that merits discussion: whether the prosecutor's failure to correct false evidence connected to the importation charges of May 1985 and February 1986 resulted in denying him a fair trial. Bahr moved for a new trial, claiming that the court improperly allowed the introduction of false testimony. He argues that the falsity of Reinertsen's testimony became apparent to the prosecutor from Daniels' statements to the FBI agent. Because the evidence could be considered by the jury, Bahr asserts that his conviction was tainted.

The district court denied Bahr's motion for a new trial. Bahr argues that the prosecutor's failure to correct the evidence had a prejudicial effect resulting in his conviction on three conspiracy counts and on three substantive counts relating to the November 5, 1985 offloading operation.

■ The standard of review is whether the prosecutor's failure to correct false evidence may have had an effect on the outcome of the trial. *Napue v. Illinois*, 360 U.S. 264, 272, 79 S.Ct. 1173, 1179, 3 L.Ed.2d 1217 (1959); *United States v. Rivera Pedin*, 861 F.2d 1522, 1529–30 (11th Cir.1988).

Bahr argues that the prosecutor had the affirmative duty to correct the falsity of Reinertsen's "extensive and prejudicial testimony," once its falsity became apparent, and not to make use of it in closing argument. His position is that "had the jury known that Reinertsen's otherwise vivid recollection of Bahr's involvement was false as to three of the four incidents he had described, the jury could have reasonably concluded that his recollection was false as to the fourth incident."

■ "Deliberate deception of a court and jurors by the presentation of known false testimony is incompatible with rudimentary demands of justice." *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir.1991) [citation omitted]. In Bahr's case, Reinertsen's testimony with respect to several offloading operations conflicts with Daniels' account where he thought Bahr was not involved in two of the operations. However, knowledge of falsity of testimony is not imputed to the prosecutor when a key government witness' testimony is in conflict with another's statement. *See United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981) [citations omitted].

■ The government argues that Bahr never met his burden of showing that the prosecutor knew Reinertsen's testimony to be false. We agree. Only knowing use of perjured testimony constitutes a due process violation. *Jacobs v. Singletary*, 952 F.2d 1282, 1287 n. 3 (11th Cir.1992). Under these circumstances, the government's obligation to correct false testimony did not arise.

The witnesses' capacity to remember events, and the witnesses' possible motives and individual relationships with Bahr may be considered as factors in weighing their testimony. However, the fact that Reinertsen and Daniels remembered the incidents and participants differently and told different stories falls far short of establishing that the government had knowledge of false testimony being presented to the jury. Although Daniels did not testify, Bahr challenged Reinertsen's credibility in the defense case.

We have examined Bahr's other assignments of error which raise the issues of denial of severance and prejudicial prosecutorial comments, and find them to be without merit.

## ISSUES RAISED BY DE LOS SANTOS

De Los Santos presents one issue that merits discussion: whether the district court erred in denying his motion for judgment of acquittal where the evidence was insufficient, as a matter of law, to sustain his convictions. De Los Santos argues that the proof demonstrated only his mere presence and association with various of his codefendants.

■ The standard of review is that the record, taken in a light most favorable to the government, must contain "substantial evidence" to support the verdict beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We must decide whether a reasonable fact finder could have reached a conclusion of guilt beyond a reasonable doubt. *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir.) *cert. denied*, —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). Viewing the evidence in the light most favorable to the government, we conclude that there is sufficient evidence to support the jury's verdict finding De Los Santos guilty.

Reinertsen and Breiceno were eyewitnesses to De Los Santos' participation in the commission of criminal acts. Reinertsen testified that De Los Santos "was assisting [them] on taking the marijuana across the beach" in the Key Waydin Island operation in May 1985. De Los Santos' was involved in the February 1986 importation, as was shown by Breiceno's testimony. During that operation, Breiceno had De Los Santos' beeper number and met him on the night that the conspirators removed the marijuana from the boat. Breiceno received a $1,000 payment for this operation from De Los Santos.

Wiretap evidence of the 1987 attempted importation presented conversations in code between De Los Santos and Hernandez concerning arrangements for the 90,-

000 pound load of marijuana. De Los Santos inquired about the condition of the "equipment at the farm". The code terms referred to a radio and a radio base station. The corroborating evidence showed that on the day following the conversation, a search of Herrera's farm disclosed high frequency radios.

We have examined De Los Santos' other assignments of error which raise the issues of violation of the fair cross-section requirement of jury selection and the jury screening process. De Los Santos also assigns as error prejudicial prosecutorial comments which he asserts invited the jury to convict him for his failure to come forward with exculpatory evidence. We find these assignments of error to be without merit.

### CONCLUSION

The convictions of all five coconspirators/defendants are AFFIRMED.

AFFIRMED.