[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/19/99
THOMAS  K. KAHN
CLERK

No. 97-2803

D. C. Docket No. 5:95-CR-05036-1/LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FENNIS OLEACH MAJORS a.k.a. F. O. Majors;
GARETH EUGENE MAJORS,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Florida

**(November 19, 1999)**

Before ANDERSON, Chief Judge, and HILL, Senior Circuit Judge, and COOK*,
Senior District Judge.

_____
 *Honorable Julian Abele Cook, Jr., Senior U. S. District Judge for the Eastern District of Michigan,
sitting by designation.

 HILL, Senior Circuit Judge:

Father and son appellants, F.O. Majors and Gareth Majors, were convicted by a jury in 1996 on sixteen counts of conspiracy to commit mail fraud; conspiracy to commit securities fraud; conspiracy to commit money laundering; mail fraud; and money laundering. While appellants raise eleven issues on appeal,[1] we find that only three trial-related issues merit discussion: (1) sufficiency of the evidence on the fraud counts, as to Gareth Majors only; on the money laundering counts, as to both Gareth Majors and F.O. Majors; (2) admissibility of the government's expert witness testimony; and (3) admissibility of evidence seized pursuant to a search warrant. Based upon the following, we affirm the judgments of conviction and sentences of both appellants.

I.

The thirty-six page indictment alleged that, over a twenty-year period, using four corporations,[2] F.O. and Gareth Majors, conspired to defraud investors by selling

---

[1] We affirm the eight remaining issues without discussion. *See* 11th Cir. R. 36-1.

[2] The corporations, also named as defendants in the indictment, were Alliance Fuel Corporation (AFC) [where F.O. Majors was president and a director]; Alliance Petroleum, Inc. [where F.O. Majors was a director; and Gareth Majors was president and a director]; I.R.M. Corporation, Inc. [where F.O. Majors was a director and resident agent; and Gareth Majors was president and a director]; and Virex Corporation [where F.O. Majors was chief executive officer and chairman of the board of directors].

millions of dollars of worthless securities, bogus licenses and phoney distributorships, by representing: (1) that they possessed the rights to a patented new "secret formula" for producing a synthetic fuel additive;[3] (2) that they were building a blending plant which would use as fuel buffalo gourds grown by local farmers;[4] and (3) that they held the formula rights to a new cleaning fluid that killed the HIV virus.[5]

Aided by classic con-man methods and unmitigated gall, appellants claimed to be successful entrepreneurs who, through gilded representations, duped unwary investors to invest in their corporations, which were falsely touted to be viable, profitable, and manned by full staffs of office and laboratory personnel. Supplied with inconsistent, unsubstantiated and inflated balance sheets, stockholders were guaranteed large profits and dividends. From 1984 through 1996, they invested $3,296,900.72 with appellants. In turn, appellants used these funds[6] for their own personal living and European travel expenses.

---

[3] Tests by the State of Florida determined the additive to be worthless, consisting of plain alcohol.

[4] Although elaborate ground-breaking ceremonies were held, no plant reached the planning stages.

[5] Investors learned that the solution was merely a generic disinfectant home-bottled into a few samples.

[6] Before reaching appellants' pockets, monies would be transferred several times between corporations in what, the indictment alleged, was an attempt to launder funds.

II.

In 1996, pursuant to an investigation by the Federal Bureau of Investigation, an FBI special agent submitted an affidavit in support of a request for search warrant to search the premises of one of appellants' corporations, Alliance Fuel Corporation (AFC). A search warrant was issued authorizing the search of the AFC premises for "[b]ooks, [l]edgers, [r]eceipts, [i]nvoices, [b]usiness records, the identification of [f]inancial accounts and any other evidence which is evidence in violation of Title 18 United States Code Sections 1341 and 1343." As a result of the search, thousands of documents were seized by the government.

After months of analyzing these documents, FBI financial analyst Mr. Michael Root testified as an expert witness for the government at trial. It was his opinion that $3.3 million approximated the dollar amount of fraud perpetrated by appellants upon investors for the relevant twelve-year time period.

At the conclusion of a two-week trial, the jury convicted appellants on all counts as charged. F.O. Majors was convicted of conspiracy to commit crimes against the United States, 18 U.S.C. § 371 (count 1)[7]; mail fraud, 18 U.S.C. § 1341 (counts

---

[7] Count 1 charged defendants with participating in a conspiracy that had three objects: (1) to commit mail fraud, in violation of 18 U.S.C. § 1341; (2) to commit securities fraud, in violation of 15 U.S.C. § 77 (q); and (3) to commit money laundering, in violation of 18 U.S.C. § 1956.

2-4); and laundering of monetary instruments, 18 U.S.C. § 1956(a)(1) (counts 5-8, 10 and 14-16). He was sentenced to a total term of ninety-six months' imprisonment. Gareth Majors was convicted of conspiracy to commit crimes against the United States, 18 U.S.C. § 371 (count 1); and money laundering, 18 U.S.C. § 1956(a)(1) (counts 9 and 11). He was sentenced to sixty-three months' imprisonment. Appellants now appeal their convictions and sentences.

## III.

## A.

We limit our discussion of the sufficiency of the evidence of a scheme to defraud as to Gareth Majors only. We discuss the sufficiency of the evidence on the money laundering counts, as to both appellants.

Whether there is sufficient evidence to support the convictions is a question of law subject to our *de novo* review. *United States v. Fischer*, 168 F.3d 1273, 1276 (11th Cir. 1999), *petition for cert. filed*, 68 U.S.L.W. 3080 (July 15, 1999) (No. 99-11). In reviewing the sufficiency of the evidence to support the jury verdict, we view the evidence in the light most favorable to the government . . . all reasonable inferences and credibility choices are made in the government's favor. *Id.* Accepting all reasonable inferences from the evidence which support the verdict, we will affirm the convictions if a reasonable fact-finder could have reached a conclusion of guilt

5

beyond a reasonable doubt.  *United States v. Lopez*, 985 F.2d 520, 524 (11th Cir. 1993).  It is not necessary for the government to disprove every reasonable hypothesis of innocence, as a jury is "free to choose among reasonable constructions of the evidence."  *United States v. Jones*, 913 F.2d 1552, 1557 (11th Cir. 1990).

1.

Gareth Majors adopts his father's argument on appeal that he is not guilty of conspiracy to commit fraud because he made "no real misrepresentations" and that "to the extent any statements were inaccurate or misleading, any reasonable person could have - and would have investigated or evaluated the claims and the investment before handing over thousands of dollars."  He claims that shareholders knew that the projects would not succeed unless financing was obtained; that European travel expenses were incurred in an attempt to obtain financing; and that shareholder investments were, by their very nature, risky.

Gareth characterizes his actions as "just puffing, misunderstandings, and . . . failed business efforts," *United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir. 1996), not actionable under the mail fraud statute. "[W]ithout some objective evidence demonstrating a scheme to defraud, all promotional schemes to make money, even if 'sleazy' or 'shrewd,' would be subject to prosecution on the mere whim of the

prosecutor. More is required under our criminal law." *Id.* at 1562 n. 20 (quoting

*United States v. Goodman*, 984 F.2d 235, 240 (8th Cir. 1993)).

The government contends that at trial it presented objective evidence of a

scheme to defraud and proved Gareth's participation in the conspiracy beyond a

reasonable doubt. *See United States v. High*, 117 F.3d 464, 468 (11th Cir. 1997) (to

support a conviction for conspiracy, the government must prove only that two or more

persons agreed to commit a crime, that the defendant knew of the conspiratorial goal,

and that he voluntarily participated in helping to accomplish that goal). The existence

of such an agreement may be proved by either direct or circumstantial evidence; a

common scheme or plan may be inferred from the conduct of the alleged participants

or from other circumstances. *Jones*, 913 F.2d at 1557.[8]

We have reviewed the entire record, including the trial transcript. Evidence of

Gareth's participation in the conspiracy to defraud investors is present throughout.

He was president and a director of two of the four corporations involved. He had

---

[8] The government, citing *United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994), urges upon us the proposition that, having established the existence of a conspiracy, it need come forward with only "slight evidence" to connect a particular defendant with it. It is unfortunate that misleading language to that effect may be found in some cases, even after the "slight evidence" concept was "banished" in *United States v. Malatesta*, 590 F.2d 1379, 1382 (5th Cir. 1979). For an exposition of the correct rule, read *United States v. Toler*, 144 F.3d 1423, 1426-1428 (11th Cir. 1998).

signatory authority on stock certificates. He signed fraudulent newsletters and corporate literature misrepresenting the financial condition of the companies. He signed at least one letter of investor inducement and provided inflated financial statements to potential investors. In addition, Gareth participated in the European trips, stockholder meetings and board meetings. When his father was absent from the office, he served as office manager, accountant and signatory, answering stockholder inquiries by telephone. It is clear from the evidence presented that there was a scheme to defraud investors; that Gareth knew of its general purpose; and that he knowingly and voluntarily participated in it. *High*, 117 F.3d at 468. Instead of disassociating himself from on-going illegal activity, Gareth knowingly associated himself, furthering its purpose. *See United States v. Rudisill*, — F.3d — (11th Cir. Sept. 3, 1999).

In short, the record is replete with objective evidence of actions by Gareth which far surpass puffing or sellers' talk. *Brown*, 79 F.3d at 1557. While perhaps Gareth was not the ringleader of the conspiracy, the apple did not fall far from the tree. Viewed in the light most favorable to the government, the evidence is pervasive to support the jury's verdict. *Fischer*, 168 F.3d at 1276.

2.

a.

We next examine the sufficiency of the evidence supporting the convictions of the appellants on the money laundering counts. Counts V through XVI[9] of the indictment charge appellants with money laundering under Section 1956 (a)(1)(B)(I).[10]

---

[9] The concealment element of money laundering alleged in the indictment is that investors' funds were indirectly funneled into appellants' own personal bank accounts after passing through AFC or Virex; through AFC (via two different accounts at two different banks); or through Virex to IRM (via two different accounts at two different banks).

[10] Section 1956 (a)(1)(B)(i) provides as follows:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --

***

(B) knowing that the transaction is designed in whole or in part --
(i) to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity
***
shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Section 1956 (a)(1)(B)(I) is sometimes referred to as the "concealment" or "design" provision of the money laundering statute. *See United States v. Calderon*, 169 F.3d 718, 720 (11th Cir. 1999);[11] *United States v. Burns*, 162 F.3d 840, 848 (5th Cir. 1998).[12] A violation of the concealment provision must "follow in time" the completion of the underlying transaction as an activity designed to conceal or disguise the origins of the proceeds. *See United States v. Dimeck*, 24 F.3d 1239, 1246 (10th Cir. 1994).[13] This section of the money laundering statute was designed to punish

[11] Section 1956 (a)(1)(A)(I) has been referred to as the promotion prong of the money laundering statute. *Calderon*, 169 F.3d at 722 n.5. For sentencing purposes, a defendant convicted under the promotion prong receives a base offense level of 23, U.S.S.G. § 2S1.1, while one convicted under the concealment prong, Section 1956 (a)(1)(B)(I), receives a base offense level of 20. *Id*. A greater punishment is applied to those defendants who encourage or facilitate the commission of further crimes. U.S.S.G. § 2S1.1, commentary.

[12] Section 1956 (a)(1)(B)(I) is a provision structured to reach those types of money laundering activities designed to conceal or disguise the attributes of proceeds produced by unlawful activity. *United States v. Tokars*, 95 F.3d 1520, 1539 (11th Cir. 1996), citing *United States v. Miller*, 22 F.3d 1075, 1079 (11th Cir. 1994) (where it is "illegal to knowingly enter into a financial transaction involving the proceeds of a 'specified unlawful activity' with the intent to conceal or disguise the nature, location, source, ownership, or control of those proceeds"). The activity that Section 1956 (a)(1)(B)(I) seeks to prevent is the injection of illegal proceeds into the stream of commerce while obfuscating their source. *United States v. Wynn*, 61 F.3d 921, 927 (D.C. Cir. 1995).

[13] Before the primary offense of money laundering can occur, the underlying criminal activity must be complete, generating proceeds to be laundered. *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997) (where the withdrawal of bank funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud and misapplication of bank funds).

defendants who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises. *Id.* (citations omitted).[14]  In this case, the government had to prove to the jury that: (1) that appellants conducted or attempted to conduct a financial transaction; (2) that the transaction involved the proceeds of a statutorily specified unlawful activity; (3) that appellants knew the proceeds were from some form of illegal activity; and (4) that appellants knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. Section 1956 (a)(1)(B)(I).  In this appeal, appellants claim insufficient evidence only as to part (4).[15]

b.

Appellants contend that the government failed to prove the concealment charges under the indictment.  They claim their facts are similar to those in *United States v. Dobbs,* 63 F.3d 391, 397 (5th Cir. 1995), where the court found that money laundering

---

[14] Money laundering is not a continuing offense. *See United States v. Kramer*, 73 F.3d 1067, 1072 (11th Cir. 1996).  The statutory language and legislative history indicate that each transaction or transfer of money constitutes a separate offense. *Id.* citing S.Rep. No. 433, 99th Cong.2d Sess. 12-13 (1986).

[15] We find Gareth's claim that he did not know that the property involved represented the proceeds of criminal enterprise to be without merit. *See* Part III.A *supra*.

was not present when a husband deposited funds into his wife's bank account to pay ordinary household expenses. Similarly here, they claim that there was no intent to disguise or conceal the inter-company transfers,[16] that there was nothing inappropriate about the open and notorious transfers, and that the transfers were simply payments for reasonable and necessary business expenses. Appellants argue that the government's expert witness, Mr. Root, based his opinion that concealment was present on the sheer volume of inter-company transfers, nothing else. Contrary to Mr. Root's opinion, appellants assert that evidence of their concealment was not substantial. *See United States v. Garcia-Emanuel,* 14 F.3d 1469, 1476 (10th Cir. 1994). They claim that the government's broad interpretation has turned the money laundering statute into a "money spending statute," contrary to Congressional intent. *Id.*

c.

The government contends that it proved the concealment prong at trial. In an elaborate shell game, appellants moved ill-gotten funds in and out of various corporate

---

[16] The indictment charged that funds were transferred either through AFC or Virex directly to appellants or through AFC (two different accounts at two different banks) or Virex to IRM (two different accounts at two different banks), and then to appellants.

bank accounts, previously set up in multiple signatory names. These moves were designed to make the funds ultimately enjoyed by appellants appear as legitimate income not derived from the company in which an investor had invested. Appellants received "sanitized" funds.[17] The sheer volume of these transfers and the number of lies uttered by appellants to investors, claims the government, satisfies the substantiality test of *Garcia*. *See also United States v. Hurley*, 63 F.3d 1 (1st Cir. 1995). Once the concealment element is proven, the government has met its burden of proof. *See United States v. Wilson*, 77 F.3d 105, 108-109 (5th Cir. 1996); *United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995).

d.

Authority as to the sufficiency of the evidence of money laundering under Section 1956 (a)(1)(B)(I) is sparse in this circuit. *See United States v. Gregg*, 179 F.3d 1312, 1315-16 (11th Cir. 1999). Accordingly we must turn to the case law of other circuits for guidance.

---

[17] These transfers were allegedly concealed from investors in order to further the conspiracy and keep the money flowing. Any type of exposure would have alerted investors, as it was counter to appellants' continuous requests for additional funds. Appellants allegedly told investors that they never took any money for their own use out of the companies. Investors were apparently told that appellants were using their own private funds just to keep the companies solvent.

In 1994, the Tenth Circuit in *Garcia-Emanuel*, attempted to discern certain principles governing Section 1956 (a)(1)(B)(I) appeals, a "difficult task of separating money laundering, which is punishable by up to twenty years in prison, from mere money spending, which is legal." *Id.* at 1473. Because the statute is aimed at transactions that are engaged in for the purpose of concealing assets, "[m]erely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime . . . [i]f transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute." *Id.* at 1469.

The Tenth Circuit concluded that no list of categories[18] can govern a jury's decision about what is sufficient evidence to sustain a conviction of money laundering beyond a reasonable doubt, but that juries, upon proper instruction, must rigorously enforce two disciplines. *Garcia-Emanuel*, 14 F.3d at 1476. That first is that Section 1956 (a)(1)(B)(I) is a concealment statute, not a spending statute. The second is the

_____

[18] Evidence that may be considered when determining whether a transaction was designed to conceal includes, among others, statements by a defendant probative if intent to conceal; unusual secrecy surround the transaction; *structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction;* or expert testimony on practices of criminals. *Garcia-Emanuel*, 14 F.3d at 1475-76 (emphasis on evidence present in this case).

requirement that the evidence of concealment must be substantial.[19] *Id.* We subscribe to both these disciplines.

We next turn to case authority from the Fifth Circuit. Appellants liken their factual setting to that of *Dobbs*, 63 F.3d at 391. In *Dobbs,* the court reversed a money laundering conviction because the transactions were as open and notorious as typical bank transactions can be. *Id.* at 397. The cattle rancher in *Dobbs* had been charged with money laundering when he deposited illegal cattle sale proceeds in his wife's bank account used to pay ordinary household and ranch expenses.

The facts here are unlike those in *Dobbs*. The *Dobbs* transactions were not disguised by the use of third parties. *See id.* Here the deposit of checks made payable to IRM from AFC or Virex were disguised by the use of a third party, namely IRM. Appellants' connection to IRM could be discovered only by accessing bank or corporate records of IRM, and then tracing the funds from the IRM account to the personal accounts of appellants.

In *United States v. Powers*, 168 F.3d 741, 747-48 (5th Cir. 1999), *petition for cert. filed*, (Sept. 3, 1999) (No. 99-6112), the deposit of checks made payable to the

---

[19] The Tenth Circuit reversed convictions in *United States v. Sanders*, 928 F.2d 940 (10th Cir. 1991) and *United States v. Lovett*, 964 F.2d 1029 (10th Cir. 1992), both cases involving purchases of vehicles with proceeds from illegal transactions with titles registered in family members' names.

ITEX corporation from the Long Valley corporation were disguised by the use of a third party, ITEX. *Id.* at 748. Checks from Long Valley to ITEX did not reveal that Powers or his wife were involved in the transactions. Powers' connection to ITEX could be discovered only by accessing the bank records of ITEX, finding out that Mrs. Powers had an interest in the account, and then tracing the funds from the ITEX account to the couple's personal account. *Id.* The Fifth Circuit found that Powers' use of ITEX evidenced a sufficient intent to conceal the source of illegal funds and confirmed Powers' money laundering convictions. *Id.* The facts here are very similar. *See Burns*, 162 F.3d at 847-49 (where an ordinary check transfer between two bank accounts conducted in plain view was the final step of a larger money laundering scheme willfully designed to give the defendant access to the illegal proceeds); *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir. 1991) (evidence that defendant treated the illegal funds commingled in legitimate church accounts as his own sufficient to support finding of design to conceal); *United States v. Termini*, 992 F.2d 879, 880 (8th Cir. 1993) (commingling illegal gambling proceeds in legitimate corporate bank accounts sufficient to establish a design to conceal); *United States v. Nattier*, 127 F.3d 655, 658-59 (8th Cir. 1997) (depositing embezzled funds in the seemingly legitimate business account of IRI and then transferring them to another account in the name of defendant and his father). Moving money through a large number of accounts has, in

16

light of other evidence, has also been found to support the design element of money laundering, even when all the accounts to which the defendant transferred the money and from which he withdrew were in his own name. *United States v. Willey,* 57 F.3d 1374, 1385 (5th Cir. 1995) citing *Lovett*, 964 F.2d at 1036.

By depositing illegitimate funds in the business accounts of AFC and Virex, then, by transferring monies from AFC and Virex to legitimate business accounts of IRM, and then by transferring the monies from IRM directly into their own pockets, appellants knew they were concealing the nature or source of the proceeds of an unlawful activity under the terms of the statute. *See Nattier*, 127 F.3d at 658-59. The evidence, viewed in the light most favorable to the government, supports the jury's finding that the appellants had a specific intent to structure their financial transactions so as to conceal or disguise the true nature and source of the transfer of funds between corporations and, ultimately, to them. *See United States v. Wilkinson*, 137 F.3d 214, 222 (4th Cir. 1997). We reject appellants' challenge to the sufficiency of the government's proof under Section 1956 (a)(1)(B)(I) and conclude that there is sufficient evidence of a design to conceal. Appellants' money laundering convictions stand.

B.

We now turn to the admissibility, under Fed. R. Evid. 702, of Mr. Root's testimony as the government's financial expert. Appellants contend that Mr. Root should not have been accepted as an expert as he was not a certified public accountant, holding only an associate's degree in accounting. They also claim he had no experience in small business management or in the preparation of consolidated financial statements.

Appellants strongly assert that Mr. Root's opinion, that $3.3 million was the amount of the fraud, was erroneous, not supported by the facts, and caused them great prejudice. Gareth argues that the district court's failure to conduct a hearing on the admissibility of Mr. Root's testimony and to make specific fact findings concerning the application of Rule 702 in this case rendered his trial unfair. *United States v. Lee*, 25 F.3d 997, 998 (11th Cir. 1994), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993).

The government's response to these assertions is that Mr. Root's expertise qualified him to render an opinion based upon his analysis of appellants' financial records. It was shown that Mr. Root worked as a financial analyst with the FBI for eight and one-half years; that he had performed financial analyses in more than fifty previous cases. In short, the government contends that Mr. Root possessed special skills and knowledge not possessed by ordinary witnesses, sufficient to meet the

18

guidelines of Fed. R. Evid. 702; that he was not required to be a certified public accountant; *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977), and that his testimony was properly admitted by the district court.

The Federal Rules of Evidence provide for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed. R. Evid. 702. Under Rule 702, in such situations a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify . . . in the form of an opinion or otherwise." *Id*.

In 1993, the Supreme Court, in *Daubert*, 113 S. Ct. at 2786, focused upon the admissibility of scientific expert testimony, finding that such testimony is admissible only if it is both relevant and reliable. In order to ensure that both of these elements are present, the Supreme Court held that, under Fed. R. Evid. 702, the trial judge serves as a "gatekeeper." *Id.* at 2796-97. Then, in 1999, in *Kumho Tire Co., Ltd. v. Carmichael*, 119 S. Ct. 1167 (1999), the Supreme Court extended *Daubert*'s gatekeeping obligation beyond scientific experts. The trial judge is required to inquire into the areas of relevance and reliability whether the expert testimony is "scientific" or otherwise. *Id.* at 1174; *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999). "[F]ederal district courts . . . perform [this] important gatekeeping function by screening the reliability of all expert testimony, but they have substantial discretion

in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." *Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc.,* 178 F.3d 1030, 1034 (8th Cir. 1999), citing *Kumho*, 119 S. Ct. at 1174-76.

A district court's decision to admit or exclude expert testimony under Rule 702 is reviewed for abuse of discretion. *General Elec. Co. v. Joiner*, 118 S. Ct. 512, 517 (1997); *United States v. Gilliard*, 133 F.3d 809, 812 (11th Cir. 1998). Here Mr. Root had previously performed financial analyses for the FBI in over fifty cases for more than eight and one-half years. He had testified in certain of these cases involving bank fraud, mail fraud and money laundering investigations. By virtue of training and experience, he possessed special knowledge and skill not available to the ordinary witness. Fed. R. Evid. 702. We conclude that the district court did not err in admitting Root's testimony.

## C.

The final trial-related issue of this case is the admissibility of evidence seized by the search warrant. We have reviewed the original record in this case, including the application for search warrant and attached affidavit. The search warrant was supported by probable cause set forth in the ten-page affidavit. *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990). It was not over-broad. Due to the peculiar nature of a charge of fraud, especially where corporations are used as vehicles of

fraud, an application to search the premises of AFC for "[b]ooks, [l]edgers, [r]eceipts, [i]nvoices, [b]usiness records, the identification of [f]inancial accounts and any other evidence which is evidence in violation of Title 18 United States Code Sections 1341 and 1343," describes with particularity the items to be seized. *See United States v. Accardo*, 749 F.2d 1477, 1479 n.3 (11th Cir. 1985) (where there is probable cause to believe that an enterprise is engaging in a pervasive scheme to defraud, all corporate records may be seized).

Based upon our review of the record, under the particular facts and circumstances of this case, the constitutional search and seizure requirements of the Fourth Amendment have been satisfied. The district court did not err in allowing admission of evidence seized pursuant to the execution of the AFC search warrant.

IV.

The judgments of conviction and sentences of F.O. Majors and Gareth Majors are AFFIRMED.