[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-16469

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 24, 2005
THOMAS  K. KAHN
CLERK

D. C. Docket No. 02-20669-CR-UUB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN G. CHAMBERS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 24, 2005)**

Before BIRCH, CARNES and RONEY, Circuit Judges.

PER CURIAM:

Following a sting operation conducted jointly by the FBI and the Royal

Canadian Mounted Police, Martin Chambers, a Canadian citizen, was arrested in the United States and charged with one count of conspiracy to launder drug money, in violation of 18 U.S.C. § 1956(h), and with four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B) and § 2. Chambers was convicted by a jury of all charges, and he was sentenced to 188 months imprisonment.

Chambers contends that: (1) the district court erred by not dismissing his indictment due to "outrageous government misconduct"; (2) the district court improperly admitted testimony; (3) the evidence was insufficient to sustain his conviction; and, (4) the district court erroneously concluded during sentencing that it lacked the jurisdiction to downwardly depart.

**I.**

In 2002 Corporal William Majcher of the Royal Canadian Mounted Police was assisting the FBI in an undercover operation called "Bermuda Short." Majcher played the role of financial front man for a cocaine cartel run by "Ricardo," a fictional Columbian national played by an FBI special agent. Majcher pretended to Kevan Garner, a Canadian citizen, that he was attempting to launder drug money. In response Garner suggested that they contact Chambers. Garner described Chambers as a man who could introduce large amounts of illegally obtained cash into the legitimate banking system.

2

The RCMP had previously investigated Chambers in connection with a stock manipulation scheme, but that investigation had not resulted in any charges against him. Upon learning that Chambers would become a target of "Operation Bermuda Short," Corporal Majcher made several telephone calls to friends and associates expressing his excitement, telling them that he had hit a "grand slam" and vowing to do "whatever" it would take to "get" Chambers. Majcher also expressed his desire to have Chambers prosecuted and sentenced in the United States instead of in Canada. American law would allow Majcher to record all of his conversations with Chambers without Chambers' consent or judicial approval, making it easier to build a case against Chambers. It also offered harsher sentences in drug cases than Canadian law.

Garner arranged the first of a series of meetings between Corporal Majcher and Chambers for April 11, 2002 in South Florida. Before that meeting Garner advised Majcher that it would not be necessary to tell Chambers that the money they would be laundering originated in the drug trade. Garner recommended: "Just don't mention . . . the source." Majcher followed Garner's advice, though he did make a series of comments to Chambers during the meeting which indicated that the money came from an illegitimate source. He told Chambers they didn't want to take any risks laundering the money because "we feel that we are already

3

taking the risk in the initial instance and there's no need to duplicate that." In response to Majcher's comments, Chambers replied: "I am not unfamiliar with historical reasons with your perspective."

Chambers informed Corporal Majcher that he and a close friend had formed a bank in Barbados in connection with the Russian mafia. He offered to introduce Majcher to Michael Hepburn, a Bahamian banker, the next day. Chambers told Majcher that Hepburn and his associates had "indicated that they're prepared to take and deposit substantial quantities of cash and they have no limits in doing so." There would be no need, Chambers said, for Majcher to mention his "antecedents and background" to Hepburn. Chambers reminded Majcher that the transactions they were discussing were not "conventional" and stated that "this is as risky situation for us as for you." Chambers also informed Majcher that there would be a fee for depositing the cash, and he discussed keeping a portion of the cash on deposit to avoid regulatory attention.

On April 12, 2002, before they met with Chambers and Hepburn, Garner had told Chambers and Hepburn that "Ricardo" (the fictional drug lord) was a member of a family involved in importing and exporting commodities in South America. Garner had explained to them that Ricardo's family only invoiced purchasers for half of the goods they actually sold and accepted cash for the other half. Ricardo

4

now wanted to launder the cash receipts. In light of Garner's earlier representations to Chambers and Hepburn, Corporal Majcher did not mention the source of the money during his April 12th meeting with them. Majcher did discuss his own background in commodities and described Ricardo's family as involved in the import and export of grain.

With respect to the money laundering, Corporal Majcher told Chambers and Hepburn that they were looking for "something that passes any smell test." Hepburn explained that 6% to 12% of the cash deposits would be assessed as a fee; he described this fee as reasonable considering the fact that most banks would not accept the cash at all. During this meeting, Chambers and Hepburn created a shell corporation, "Northern Star Investments, Limited," to disguise the source of the money they would receive. Chambers prepared applications to open bank accounts for Northern Star. While Chambers was out of the room, Hepburn asked Majcher if he was satisfied that there was no drug connection to the money. Majcher "blew him off."

The next meeting between Corporal Majcher and Chambers was about six weeks later on May 24, 2002. They discussed the logistics of money laundering. Chambers suggested bribing a Bahamian police official and using Chinese supermarkets as a method of moving cash. Majcher then informed Chambers

5

about a conversation he had with Hepburn that had "made [him] very unhappy." He told Chambers that Hepburn had asked if he was satisfied that none of the money they were laundering came from drug trafficking. Chambers told Majcher that he was aware of the conversation. Majcher then described his reaction to Hepburn's inquiry:

> I'm fuckin looking at this guy, and I'm looking at him, you know, yeah, yeah, it's fuckin cocaine, K-O-K-A-N-E, what are you, a fuckin moron? I mean, I, and in fact I blew him off, I just laughed at him and said what are you, fuckin kidding me? I mean, of course this is cocaine money, you think I'm going to fucking sit there and tell you what this is? You know, like, what the fuck are you? Like, [Chambers], I didn't appreciate that and I'm wondering, is this a set-up? Is this, am I the guy being set up here? Like, I was not an hap-, a happy camper at that point.

Chambers replied that he "was appalled when [he] heard it, appalled." Majcher continued to express concern over whether he was being set-up. He declared that he only wanted to "deal with professionals." As Majcher ranted, Chambers twice replied, "Exactly." Majcher then said, "I mean, [Chambers], you know what we're talking about here. I mean, let's—let us agree right now." Chambers replied: "Ah, we know exactly what we're talking about."

Later in the meeting, Corporal Majcher described "Ricardo": "He uh, he's a proud guy, he's a family guy, uh, you know what, the cocaine side of the business is not his business, he is purely the money side, uh, he doesn't want to see any comments or references uh, to it."

On May 24, 2002 Corporal Majcher gave Chambers two large tote bags filled with $500,000 in cash. Majcher and Chambers discussed their respective abilities to hide if the police became aware of their activities. By June 13, 2002, about $446,000 of the $500,000 was returned, via wire transfer, to Majcher's account at SunTrust Bank in Miami.

On June 18, 2002 Chambers and Corporal Majcher met to discuss the next transaction. Chambers became confrontational when Majcher informed him that the $200,000 for the next transaction was not yet available.

On June 19, 2002 Corporal Majcher delivered $200,000 to Chambers and Hepburn. Majcher and Hepburn discussed the fees for laundering the money. Chambers told Majcher that he had lived in the world that Majcher lived in and that "I know exactly what you're dealing with." He also commented: "To a very limited extent and not by choice, I operate in a not totally dissimilar world to the one you're referring to in your principals."

On July 29, 2002, $125,000 of the $200,000 was returned, via wire transfer, to Corporal Majcher's account at SunTrust Bank in Miami. On August 11 another $25,000 was wired to Majcher. Chambers was arrested before he could transfer the remainder of the money.

**II.**

7

Chambers contends that his right to substantive due process was violated by the joint investigation between the United States and Canada. He argues that his due process rights were violated when the two governments collaborated to lure him, a Canadian citizen, into the United States to commit a crime because a conviction would be easier to obtain in the United States and harsher penalties would be available here. He also alleges that his rights were violated when the two governments conspired to violate Canadian law by recording his conversations without his consent or judicial approval as required by the Canadian Charter. Chambers claims that it is hard to imagine anything more shocking than the United States inducing the law enforcement of another country to violate its own laws, which he describes as conduct so inherently offensive that it implicates the Fifth Amendment's Due Process Clause and warrants dismissal of the indictment against him.

Chambers has no authority close to point. He primarily relies on Rochin v. California, 342 U.S. 165, 72 S. Ct. 205 (1952), where evidence collection methods "shock[ed] the conscience" and violated the Due Process Clause of the Fourteenth Amendment. Id. at 172, 72 S. Ct. at 209. Though Rochin was based on the Due Process Clause of the Fourteenth Amendment, the Supreme Court has indicated that an analogous right to substantive due process exists under the Fifth

8

Amendment. See United States v. Russell, 411 U.S. 423, 431–32, 93 S. Ct 1637, 1643 (1973) (citing Rochin and stating that the Court "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction").

The law enforcement conduct in this case falls far short of that which led to the reversal of the conviction in Rochin. In that case law enforcement broke into the defendant's house, physically assaulted him in an effort to remove two capsules from his mouth, handcuffed him, took him to a hospital and had his stomach pumped against his will. Rochin, 342 U.S. at 166, 72 S. Ct. at 206. Chambers' stomach was not pumped, he was not assaulted, and he was not forced to travel to South Florida or to launder drug money. See United States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir. 1984) (noting that an individual who is invited "to participate in an illegal scheme can simply say 'No'").

Chambers voluntarily, if not eagerly, traveled to South Florida in order to meet with Corporal Majcher and discuss the money laundering scheme. Chambers introduced Majcher to Hepburn, a banker who could process large amounts of illegally obtained cash. Chambers suggested vehicles for laundering money and strategies for avoiding detection. He actually introduced $700,000 of cash into the

9

legitimate banking system.  There is nothing shocking about law enforcement agents giving Chambers an opportunity to commit the crimes he did so that they could prosecute him.  Majcher's eagerness to apprehend Chambers might appear unseemly to some, but it certainly does not shock the conscience.

Nor is there anything unconstitutional about the agents planning the sting so that Chambers committed most of the criminal acts in this country instead of in Canada.  There is no right to have criminal opportunities occur in the location with the most lenient laws.  Chambers insists that the agents violated Canadian law when they recorded his conversations without prior judicial approval or his consent, but those recordings took place in this country.  Chambers has not persuaded us that the Canadian law relating to recorded conversations applies to activities that take place in this country, and we cannot imagine that it does.  Even if Canada intended for its laws to apply to criminal conduct occurring in this country, failure to give effect to that intent is not something that shocks our conscience.

## III.

Chambers' second contention is that the district court improperly admitted some testimony.  We review the district court's evidentiary rulings for abuse of

10

discretion. <u>Tampa Bay Shipbldg. & Repair Co. v. Cedar Shipping Co.</u>, 320 F.3d 1213, 1216 (11th Cir. 2003). "A district court's evidentiary rulings are not subject to reversal on appeal absent a clear abuse of discretion." <u>Id.</u>

The jurors were presented with tape recordings of all the conversations between Corporal Majcher and Chambers. Majcher explained to the jury what various statements in those conversations meant to him. Chambers argues that the district court improperly allowed Majcher to testify about what Chambers thought, believed, and knew. Majcher was permitted to testify as a lay witness under Fed. R. Evid. 701 about his understanding of the conversations. For over twenty years, this type of testimony by a law enforcement agent has been admissible in this circuit. <u>See</u> <u>United States v. Novaton</u>, 271 F.3d 968, 1008 (11th Cir. 2001) (stating that "we have specifically held on a number of occasions that district courts did not abuse their discretion by permitting police officers to testify under Rule 701 about their understanding of the meaning of conversations by or with criminal defendants"); <u>United States v. Awan</u>, 966 F.2d 1415, 1428–31 (11th Cir. 1992) (upholding the admission, in a case involving laundering of drug proceeds, of an undercover officer's explanations of comments made by the defendant during tape-recorded conversations with the officer); <u>United States v. Russell</u>, 703 F.2d 1243, 1248 (11th Cir. 1983) (upholding the admission of a law enforcement agent's

11

testimony concerning the meaning of tape-recorded conversations he had with the defendant).

Rule 701 was amended in 2000 to add subdivsion (c).[1] We have held, however, that this amendment does not alter our Rule 701 jurisprudence in cases where law enforcement officers testify as lay witnesses. Tampa Bay Shipbldg. & Repair Co., 320 F.3d at 1220–23; see also id. at 1223 n.17 ("We find no basis to determine that Novaton . . . and Myers, based on their facts, require a different finding after Rule 701's Amendment."). The district court's admission of Corporal Majcher's testimony accords with our case law; the district court did not abuse its discretion.[2]

## IV.

---

[1] Rule 701 now states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

[2] Chambers also asserts that Corporal Majcher's testimony was expert testimony governed by Rules 702 and 704(b) rather than by Rule 701. Because this argument was not raised before the district court, we do not consider it. See United States v. Prichett, 898 F.2d 130, 131 (11th Cir. 1990) ("[W]e will not consider an argument raised for the first time on appeal.").

Chambers next contends that the evidence was insufficient to convict him under 18 U.S.C. §§ 1956(a)(3)(B) & (h). To be convicted under that statute, the defendant must have been aware that the funds being laundered were obtained through drug trafficking. Chambers argues that the evidence was not sufficient to prove that he knew the origin of the funds.

We review de novo whether there is sufficient evidence to support a conviction, viewing all the evidence in the light most favorable to the government. United States v. Majors, 196 F.3d 1206, 1210 (11th Cir. 1999). "Accepting all reasonable inferences from the evidence which support the verdict, we will affirm the convictions if a reasonable fact-finder could have reached a conclusion of guilt beyond a reasonable doubt." Id. Though many of the statements made by Corporal Majcher and Chambers were oblique, there was enough evidence for a reasonable factfinder to have concluded that Chambers was guilty beyond a reasonable doubt of laundering and conspiring to launder drug money.

Chambers told Corporal Majcher that he did not need to mention his "antecedents and background" to Hepburn, the banker. After Hepburn asked Majcher if he was sure the money they were laundering didn't come from drugs, Majcher told Chambers that he wanted to "deal with professionals." Chambers replied: "Ah, we know exactly what we're talking about." During one meeting,

Majcher said of "Ricardo": "[T]he cocaine side of the business is not his business, he is purely the money side, uh, he doesn't want to see any comments or references uh, to it." The jury reasonably could have inferred from these comments that Chambers knew that it was drug money they were laundering.

**V.**

Finally, Chambers asserts that the district court committed reversible error by refusing to consider granting him a downward departure, pursuant to U.S.S.G. § 5K2.0, due to his "extraordinary" characteristics.

We lack jurisdiction to review a sentencing court's refusal to depart downward when that decision is based on the district court's discretionary authority. United States v. Hansen, 262 F.3d 1217, 1257 (11th Cir. 2001) (per curiam). If, however, the sentencing court concluded that it lacked the authority to depart downward, we have jurisdiction and review the district court's conclusion de novo. United States v. Pressley, 345 F.3d 1205, 1209 (11th Cir. 2003)

At his sentencing hearing, Chambers made a motion for a downward departure based on a combination of factors. He asked for the departure based on his age, health, medical condition, and status as the father of a two-year-old son. He also asked that the departure be granted out of recognition for several "heroic" acts he claims to have preformed and out of recognition for the substantial

14

environmental work he has engaged in over the years. The Court declined to depart.

Chambers argues that the district court improperly concluded that it lacked the authority to depart downward. He bases his argument on the following statement the district court made during sentencing:

> Well, you know, the guidelines don't ask us to look at whether or not the person is outside the heartland of the guidelines; and that is one of the problems with the guidelines, which is that the more complex the individual is who is before the Court, the less adequate the guidelines are to address what the appropriate punishment might be.

Though this statement could possibly be interpreted as indicating that the district court thought it lacked the authority to depart downward, a further review of the sentencing transcript leads to the opposite conclusion.

After the court made the statement that is quoted in the preceding paragraph, it heard from the government. After the government had finished with its remarks, the court stated:

> Okay. Well, certainly the defendant's age, his status as a father of a young child, and his health are not individually or, or taken together, enough to take him outside the heartland of the guidelines.
>
> This other issue is a hard issue to get a handle on, but I don't know that I would say that this case, because of Mr. Chambers' work on behalf of the environment, is outside the heartland of the guidelines, because oftentimes we see people who have a disassociative capacity where they're able to operate and justify to themselves doing so outside the law and at the same time do many things that are good and productive for society.

15

So, I don't think that I can say that because Mr. Chambers had a particular interest in the environment and acted on that to a degree that is remarkable takes the case or the sentencing of Mr. Chambers outside the heartland. So, I'm not going to depart on this basis. I think it is appropriate to consider it in connection with where he should be sentenced within the guidelines.

The court then proceeded to sentence Chambers at the low-end of the applicable guideline range, rejecting the government's request that he be sentenced in the mid-range.

The court's comments indicate that it did not conclude it lacked the authority to depart downward; instead, it chose not to depart downward. The court decided to give effect to the mitigating circumstances Chambers presented by sentencing him at the low-end of the guidelines range instead of by granting him a downward departure. Because the district court's decision not to grant a downward departure was based on its discretionary authority, this Court lacks jurisdiction to review the decision.[3]

**AFFIRMED.**

---

[3] In his reply brief to this Court, Chambers challenged for the first time the constitutionality of his sentence under <u>Blakely v. Washington</u>, 542 U.S. ___, 124 S. Ct. 2531 (2004), which has now been extended by the Supreme Court in <u>United States v. Booker</u>, 543 U.S. ___, 125 S. Ct. 738 (2005). The government filed a "Motion to Strike New Issue Raised in Appellant's Reply Brief." We granted that motion.

Chambers has continued to file motions with this Court asking to be resentenced in light of <u>Booker</u>. Because the <u>Booker</u> issue was not raised in Chambers' initial brief to this Court, we do not consider it. <u>See</u> <u>United States v. Levy</u>, 379 F.3d 1241, 1242 (11th Cir. 2004) (per curiam).

RONEY, Circuit Judge, specially concurring:

I concur in the result and the reasoning contained in the opinion.